Edward E. BARKER, Plaintiff,

v.

MENOMINEE NATION CASINO, Menom-inee Gaming Commission, Menominee Tribal Legislature, Defendants.

No. 94–C–772.

United States District Court, E.D. Wisconsin.

July 26, 1995.

Edward E. Barker, Shawano, WI, pro se.

Thomas J. Parins, Parins Law Firm, S.C., Green Bay, WI, for Menominee Nation Casino.

Rebecca S. Cohen, The Cohen Law Firm, Green Bay, WI, for Menominee Gaming Com'n.

Wm. F. Kussel, Jr., Program Atty., Keshena, WI, for Menominee Tribal Legislature.

### MEMORANDUM AND ORDER

WARREN, District Judge.

Before the Court are the plaintiff's Motion for Appointment of Counsel and the defendants' Motions to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), and (6) in the above-captioned matter. For the following reasons, the plaintiff's motion is denied, the defendants' motions are granted, and this case is hereby dismissed.

On July 12, 1994, plaintiff Edward E. Barker filed the instant Complaint, in which he claims that defendants Menominee Nation Casino ("the Casino"), Menominee Tribal Gaming Commission ("the Commission"), and Menominee Tribal Legislature ("the Legislature")[1] wrongfully terminated him from his

---

1. According to the defendants, the Casino is operated by the Commission; the Commission is a wholly-owned, chartered business venture of the Menominee Indian Tribe, and was created pursuant to ordinance adopted by the Legislature under the provisions of the Constitution and By-laws of the Menominee Indian Nation. (Parins Aff. ¶ 3.) The Legislature, in turn, is "the lawful governing body of the Menominee Indian Tribe of Wisconsin with legal power vested in it by the

job as a Table Game Operator and denied his request for a gaming license after discovering that he had been convicted in June of 1989 for a misdemeanor bad check charge, and denied him due process during his request for reconsideration.[2] The Commission, however, indicates that Barker "failed to disclose this information on his application [ ] for a gaming license, even though the application requires all criminal convictions [to be] disclosed." The Casino, in turn, claims that, while the Commission heard Barker's reconsideration request on December 8, 1993 and the Legislature heard his waiver request on May 5, 1994, he brought "no legal actions or legal proceedings [ ] in the Menominee Indian Tribal Court [ ] regarding his involuntary termination of employment," (Parins Aff. ¶ 5); and the Legislature claims that, while it did deny Barker a waiver of restriction for a gaming license, it "was not a party to the decision of [the Commission] to terminate the plaintiff." (Miller Aff. ¶ 10.) The relief he requests includes compensation for "breach of promise, wrongful termination, and prejudicial treatment," as well as punitive damages. The plaintiff has also filed a Motion for the Appointment of Counsel. On September 1, 1994, the Court granted Barker's Application for Leave to Proceed *In Forma Pauperis.*

On October 13, 1994, the Casino moved to dismiss this action, arguing that the "Tribal Exhaustion Rule," *see National Farmers Union Ins. Cos. v. Crow Tribe of Indians* ("*Crow Tribe II*"), 471 U.S. 845, 856–57, 105 S.Ct. 2447, 2454, 85 L.Ed.2d 818 (1985), precludes the plaintiff from bringing this action because he failed to challenge his termination in the Menominee Tribal Court; Barker responds that, by the time his appeal to the Commission was heard on December 8, 1993, the deadline for seeking relief before the Tribal Court had expired. On October 28, 1994, the Legislature filed a motion to dis-

miss on the same grounds, and further argued that (1) the Menominee Indian Tribe, as a sovereign Indian tribe recognized by the United States government, is immune from suit, and (2) the Legislature should be dismissed because it was not Barker's employer; after expressing dissatisfaction with the hearings before the Commission and the Legislature, Barker responds that "[a]ny remedy within the Tribal Court would not be enough of a deterrent to correct this or future complaints."[3] On March 16, 1995, the Commission moved to dismiss this action because Barker had not served a copy of the Complaint within 120 days of filing; Barker responds that the Marshal's office mailed a copy of the Complaint to the address listed on the Commission's own letterhead and informed him that a response had been received. Finally, on January 19, 1995, the plaintiff filed a four-page brief in which he challenges the fairness of his hearings before the Commission and the Legislature, criticizes the "double standard" to which he claims non-tribal member employees are held by the defendants, and accuses the defendants of ignoring "their own laws and ordinances."

As an initial matter, Barker's request for appointment of counsel must be denied. The Seventh Circuit has long recognized that indigent civil litigants have no constitutional or statutory right to be represented by counsel in federal court. *Jackson v. County of McLean,* 953 F.2d 1070, 1071 (7th Cir.1992); *McKeever v. Israel,* 689 F.2d 1315, 1320 (7th Cir.1982); *Maclin v. Freake,* 650 F.2d 885, 887 (7th Cir.1981). The Court, of course, may, in our discretion, request counsel to represent indigent civil litigants under 28 U.S.C. § 1915(d), and must appoint counsel if necessary to ensure fundamental fairness and protect due process rights. *Jackson,* 953 F.2d at 1072; *McNeil v. Low-*

---

Menominee Tribal Constitution." (Miller Aff. ¶ 5.) The Casino notes that, "as a chartered business venture, the Commission operates in a corporate-like structure, with a board of directors appointed by the Menominee Tribal Legislature." (Parins Aff. ¶ 3.)

**2.** Barker states that he was hired on August 4, 1992, and was terminated on October 1, 1993.

**3.** In his summary, Barker argues that "[i]f these Tribes cannot be held accountable for promised [sic] made to people they have recruited [outside the reservation], perhaps the people of the United States should redefine their accountability to these Tribes."

*ney,* 831 F.2d 1368, 1371 (7th Cir.1987); *Maclin,* 650 F.2d at 886.

The Seventh Circuit has indicated that district courts should consider the following nonexhaustive factors in determining the appropriateness of appointing counsel under § 1915(d): (1) the merits of the indigent's claim for relief, (2) the ability of the indigent plaintiff to investigate crucial facts unaided by counsel, (3) whether the nature of the evidence indicates that the truth will more likely be exposed where both sides are represented by counsel, (4) the capability of the indigent to present the case, and (5) the complexity of the legal issues raised by the complaint. *Jackson,* 953 F.2d at 1072; *McKeever,* 689 F.2d at 1320–21; *Maclin,* 650 F.2d at 887–88. The first factor acts as the threshold question, as "even where the claim is not frivolous, counsel is often unwarranted where the indigent's chances of success are extremely thin," and the other four factors should only be considered if this initial criterion is satisfied. *Maclin,* 650 F.2d at 887. *See also McKeever,* 689 F.2d at 1320.

In addition, "§ 1915(d) requires a threshold inquiry into the indigent's efforts to secure counsel," which, in this district, requires that he or she submit letters from at least three attorneys declining representation. *Jackson,* 953 F.2d at 1073. If an indigent civil litigant "has made no reasonable attempts to secure counsel, the court should deny any § 1915(d) motions [for appointment] outright." *Id.* Finally, while an indigent civil litigant's case is not *per se* meritless simply because he or she cannot retain counsel, "a court contemplating an appointment of counsel under § 1915(d) is justified in subjecting an indigent's claim to heightened scrutiny if the petitioner was unsuccessful in obtaining counsel ... when sifting out those claims which are patently frivolous." *Id.*

Barker has not submitted three letters from attorneys declining to represent him as required in *Jackson.* More importantly, as shall be seen, his prospects of ultimately succeeding in federal court are exceedingly remote. Given this, the Court must deny his motion for appointment of counsel, and he will be expected to follow the procedural rules listed in both the Local Rules for the Eastern District of Wisconsin and the Federal Rules of Civil Procedure in further litigating this claim. This ruling also renders the defendants' respective motions to dismiss ripe for review.

It is our view that the defendants' dismissal motions must be granted, and Barker's complaint dismissed, because the defendants, as the governing body (the Legislature) and subordinate economic enterprises (the Casino and the Commission) of the Menominee Indian Tribe ("the Tribe"), are immune from suit in federal court. As recently observed by the Seventh Circuit:

"Indian tribes are considered 'domestic dependent nations' which 'exercise inherent sovereign authority over their members and territories.' *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* 498 U.S. 505 [508], 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991). 'Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation.' *Id.; accord Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978); *United States v. United States Fidelity & Guar. Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940)."

*Altheimer & Gray v. Sioux Mfg. Corp.,* 983 F.2d 803, 812 (7th Cir.1993). As noted by the defendants, the Tribe is a sovereign Indian tribe recognized by the United States government under 25 U.S.C. § 903a *et seq.* (Miller Aff. ¶ 6); therefore, its governing body, the Legislature, possesses "the common law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara,* 436 U.S. at 58, 98 S.Ct. at 1677. The Commission and Casino, in turn, were issued a corporation charter by the Legislature through a tribal ordinance and pursuant to the Tribal Constitution (*Id.* at ¶ 3); because "an action against a tribal enterprise is, in essence, an action against the tribe itself," *see Local IV–302 Int'l Woodworkers Union of Am. v. Menominee Tribal Enter.,* 595 F.Supp. 859, 862 (E.D.Wis.1984) (Warren, J.), the Commission and Casino are likewise immune from suit unless Congress or the Leg-

islature has waived its sovereignty for purposes of this type of action. *Id.; accord Altheimer & Gray,* 983 F.2d at 812 (noting that a provision of the Sioux Tribe's tribal charter creating a subsidiary tribal manufacturing subdivision explicitly stated that sovereign immunity "is hereby expressly waived with respect to any written contract entered into by the Corporation").[4]

■ There exists no evidence in the record that the Tribe has waived its right to sovereign immunity as to any of the claims brought by Barker in this case. The Supreme Court has recognized that, in order to be effective, any waiver of the Tribe's immunity must be unequivocally expressed. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58–59, 98 S.Ct. 1670, 1676–1677, 56 L.Ed.2d 106 (1977). Unlike the defendant in *Altheimer & Gray,* the Tribe, in establishing the Commission and Casino under the Tribal Constitution, does not appear to have expressly limited its immunity from wrongful termination suits brought by disgruntled employees. Nor has Congress statutorily waived the Tribe's immunity in Title VII employment cases. *See* 42 U.S.C. § 2000e(b) (specifically excluding Indian tribes from the definition of "employer" in discrimination cases). *Accord*

*Dille v. Council of Energy Resource Tribes,* 801 F.2d 373, 374 (8th Cir.1986); *Wardle v. Ute Indian Tribe,* 623 F.2d 670, 672 (10th Cir.1980). Because Barker cannot sue the Legislature, the Commission, or the Casino in federal court based simply on a prior employment relationship, his wrongful termination, breach of promise, and discrimination claims must be dismissed, and instead may only be heard in Tribal Court.

■ Nor can he sue in federal court for the Commission and Legislature's alleged due process violations. It is true that Congress, in adopting the Indian Civil Rights Act ("ICRA"), 25 U.S.C. §§ 1301 *et seq.,* used its plenary authority to "impos[e] certain restrictions upon tribal governments similar, but not identical, to those contained in the Bill of Rights and the Fourteenth Amendment." *Santa Clara,* 436 U.S. at 57, 98 S.Ct. at 1676 (noting that, prior to the enactment of § 1302, Indian tribes were exempt from honoring constitutional rights). For example, the ICRA provides, in part, that "[n]o Indian tribe in exercising powers of self-government shall ... deprive any person of liberty or property without due process of law"; "powers of self-government," in turn, include "all governmental powers possessed

4. The Supreme Court has recognized that
 "Indian tribes are 'distinct, independent political communities,' retaining their original natural rights' in matters of local self-government. *Worcester v. Georgia,* 6 Pet. 515, 559 [8 L.Ed. 483] (1832); *see United States v. Mazurie,* 419 U.S. 544, 557 [95 S.Ct. 710, 718, 42 L.Ed.2d 706] (1975); F. Cohen, Handbook of Federal Indian Law 122–123 (1945). Although no longer 'possessed of the full attributes of sovereignty,' they remain a 'separate people, with the power of regulating their internal and social relations.' *United States v. Kagama,* 118 U.S. 375, 381–82 [6 S.Ct. 1109, 1112–1113, 30 L.Ed. 28] (1886). *See United States v. Wheeler,* 435 U.S. 313 [98 S.Ct. 1079, 55 L.Ed.2d 303] (1978). They have the power to make their own substantive law in internal matters, *see Roff v. Burney,* 168 U.S. 218 [18 S.Ct. 60, 42 L.Ed. 442] (1897) (membership); *Jones v. Meehan,* 175 U.S. 1, 29 [20 S.Ct. 1, 12, 44 L.Ed. 9] (1899) (inheritance rules); *United States v. Quiver,* 241 U.S. 602 [36 S.Ct. 699, 60 L.Ed. 1196] (1916) (domestic relations), and to enforce that law in their own forums, *see, e.g., Williams v. Lee,* 358 U.S. 217 [79 S.Ct. 269, 3 L.Ed.2d 251] (1959).
 As separate sovereigns pre-existing the Constitution, tribes have historically been regarded

 as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority ...
 As the Court in *Talton* [*v. Mayes,* 16 S.Ct. 986, 41 L.Ed. 196 (1896)] recognized, however, Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess ... [For example], [i]n 25 U.S.C. § 1302, Congress acted to modify the effect of *Talton* and its progeny by imposing certain restrictions upon tribal governments similar, but not identical, to those contained in the Bill of Rights and the Fourteenth Amendment."
 *Santa Clara,* 436 U.S. at 55–57, 98 S.Ct. at 1675–1676 (footnotes omitted).
 The immunity from suit enjoyed by Indian tribes, in turn, just like that of federal and state governments, is "an attribute of sovereignty, a privilege that attaches to sovereign rank." *State of Wisconsin v. Baker,* 698 F.2d 1323, 1333 (7th Cir.1983) (*quoting Nevada v. Hall,* 440 U.S. 410, 415, 99 S.Ct. 1182, 1185, 59 L.Ed.2d 416 (1979)). Thus, "[i]f a sovereign's powers are limited, then so too must the immunity of that sovereign's officials be limited." *Id.* In effect, Congress may limit the scope of the tribes' immunity from suit by using its power to restrict the areas over which they are sovereign.

by an Indian tribe, executive, legislative, and judicial, and all offices, bodies, and tribunals by and through which they are executed, including courts of Indian offenses." 25 U.S.C. §§ 1301, 1302(8). Assuming for the moment that Barker was denied "liberty or property" as a result of his termination or reconsideration denials, he would be protected under § 1302(8) because "the protections afforded to 'any person' under the ICRA are not limited to American Indians, but apply also to non-Indians." *White v. Pueblo of San Juan,* 728 F.2d 1307, 1313 (10th Cir.1984). *Accord Dry Creek Lodge, Inc. v. United States ("Dry Creek I"),* 515 F.2d 926, 933 (10th Cir.1975). Nevertheless, only the Tribal Court, as the judicial branch of the Tribe, and the Legislature, as the lawmaking body of the Tribe, would be subject to liability under this provision; the Commission and the Casino would not, as they are simply engaged in economic ventures, and are not "exercising powers of self-government." Barker cannot, then, sue the Commission and the Casino for any alleged breach of due process rights recognized under the ICRA.

 Nor can he sue the Tribal Court or the Legislature for ICRA violations in federal court. As acknowledged by Barker, he has not challenged the legality of his termination in Tribal Court; therefore, the Tribal Court could not have acted in a manner inconsistent with his statutory due pro-

cess rights in violation of § 1302(8). As for the Legislature, Barker must first file his statutory due process claim in Tribal Court before attempting to seek relief in federal court. In *Santa Clara,* the Supreme Court held that the ICRA could not be interpreted to impliedly create a federal cause of action against an Indian tribe or its officers for deprivation of the Act's substantive rights. *Id.,* 436 U.S. at 59, 98 S.Ct. at 1677 (noting that the only federal court remedy expressly authorized by Congress in the ICRA is § 1303, which authorizes a writ of habeas corpus to test the legality of a detention by order of an Indian tribe). Thus, "except for habeas corpus proceedings, suits [in federal court] against Indian tribes for deprivation of substantive rights recognized in the ICRA are barred by sovereign immunity." *White,* 728 F.2d at 1311. The Tenth Circuit has recognized a "narrow exception" to this rule in cases where "the aggrieved party [has] actually sought a tribal remedy [and the tribal court has failed to exercise jurisdiction], [and] not merely [ ] alleged its futility." *Id.* at 1312 (citing *Dry Creek Lodge, Inc. v. Arapahoe and Shoshone Tribes ("Dry Creek II"),* 623 F.2d 682 (10th Cir.1980), *cert. denied,* 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981), *reh. den.,* 450 U.S. 960, 101 S.Ct. 1421, 67 L.Ed.2d 385) (further noting that, in *Dry Creek II,* the disputed issue "was outside of internal tribal affairs and [involved] a non-Indian").[5] Nevertheless, it

---

5. In a decision continuing a temporary stay of the Ninth Circuit's finding that litigants seeking to challenge an Indian tribal court's exercise of jurisdiction in a civil action have no federal-court remedy, Justice Rehnquist attempted to further clarify the *Santa Clara* holding:

"Our decision in *Santa Clara Pueblo v. Martinez, supra,* which the Court of Appeals read to support its conclusion, raised the question of whether a federal court could pass on the validity of an Indian Tribe's ordinance denying membership to the children of certain female tribal members. We held that the ICRA did not imply a private cause of action to redress violations of the statutory Bill of Rights contained in the Act, and that therefore the validity of the tribal ordinance regulating membership could not be reviewed in federal court. It seems to me that this holding, relating as it did to the relationship between the right of a Tribe to regulate its own membership and the claims of those who had been denied membership, is quite distinguishable from a claim on the part of a non-Indian that a tribal court has exceed-

ed the bounds of tribal jurisdiction as enunciated in such decisions of this Court as *Montana v. United States, supra* [450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981)]. As Justice White pointed out in his dissent in *Santa Clara Pueblo v. Martinez,* 436 U.S., at 72 [98 S.Ct. at 1684], '[t]he declared purpose of the Indian Civil Rights Act ... is' to insure that the American Indian is afforded the broad constitutional rights secured to other Americans." But as the Court also pointed out in its opinion, Congress entertained the additional purpose of promoting 'the well-established federal' policy of furthering Indian self-government." *Id.,* at 62 [98 S.Ct. at 1679]. The facts as well as the holding of *Santa Clara Pueblo, supra,* satisfy me that Congress' concern in enacting the ICRA was to enlarge the rights of individual Indians as against the tribe while not unduly infringing on the right of tribal self-government. The fact that no private civil cause of action is to be implied under the ICRA, *Santa Clara Pueblo, supra,* does not to my mind fore-

is not merely required that tribal remedies be exhausted prior to seeking federal jurisdiction,[6] but rather that tribal remedies, if they exist, be considered "exclusive." *Id.*

close the likelihood that federal jurisdiction may be invoked by one who claims to have suffered from an excess beyond federally prescribed jurisdictional limits of an Indian tribal court on the basis of federal common law ... I think a fair reading of all of our case law on this subject could lead to the conclusion that even though the ICRA affords no private civil cause of action to one claiming a violation of its terms, 'Indian law' as of the time that law was enacted afforded a basis for review of tribal-court judgments claimed to be in excess of tribal-court jurisdiction."

*National Farmers Union Ins. Co. & Lodge Grass Sch. Dist. No. 27 v. Crow Tribe of Indians* ("*Crow Tribe I*"), 468 U.S. 1315, 1319–20, 105 S.Ct. 7, 10, 82 L.Ed.2d 901 (1984) (Rehnquist, Circuit Justice 1983). In *Crow Tribe II,* the Supreme Court went on to hold that, when federal and tribal courts appear to have concurrent jurisdiction, federal courts should normally allow Tribal Courts to first determine the scope and appropriateness of their own exercise of jurisdiction. *See supra* note 6. Thus, when a question exists regarding the Tribal Court's jurisdiction, comity concerns require district courts under most circumstances to abstain from deciding the matter until tribal remedies have been exhausted. In *Santa Clara,* however, the Supreme Court held that tribal, rather than federal, courts have jurisdiction over statutory civil rights claims brought under the ICRA; the "tribal exhaustion" rule was not at issue because the Supreme Court found that Congress did not intend to create concurrent federal-tribal jurisdiction.

6. In non-ICRA cases, the "tribal exhaustion" rule has been enforced by the Supreme Court as well as other Circuits. In *Crow Tribe II,* a Crow Indian minor was struck by a motorcycle in the Lodge Grass Elementary School parking lot; the school had a student body comprised of 85% Crow Indians, and was located on land owned by the State but within the boundaries of the Crow Indian Reservation. *Id.* 471 U.S. at 847, 105 S.Ct. at 2449. The child's guardian brought suit in the Crow Tribal Court, and a default judgment was entered in his favor; the school and its insurer then brought suit in federal court, requesting that Tribal authorities be enjoined from seizing school property to enforce the judgment. *Id.* at 847–48, 105 S.Ct. at 2449. The district court granted such relief, and the Ninth Circuit reversed on jurisdiction grounds. *Id.* at 848–49, 105 S.Ct. at 2449–50. In affirming the appellate court, the Supreme Court noted:

"... The District Court correctly concluded that a federal court may determine under [28 U.S.C.] § 1331 whether a tribal court has exceeded the lawful limits of its jurisdiction.

... [However], the existence and extent of a tribal court's [civil subject-matter] jurisdiction [over non-Indians] will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions.

*We believe that examination should be conducted in the first instance in the Tribal Court itself. Our cases have often recognized that Congress is committed to a policy of supporting tribal self-government and self-determination.* That policy favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge. *Moreover, the orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed.* The risks of the kind of 'procedural nightmare' that has allegedly developed in this case will be minimized if the federal court stays its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction and to rectify any errors it may have made. Exhaustion of tribal court remedies, moreover, will encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction, and will also provide other courts with the benefit of their expertise in such matters in the event of further judicial review."

*Id.* at 855–57, 105 S.Ct. at 2453–54 (footnotes omitted) (emphasis added). The Supreme Court has since recognized that, while the doctrine of "tribal exhaustion" does not deprive a district court of subject-matter jurisdiction, it should be enforced in appropriate circumstances "as a matter of comity." *Iowa Mut. Ins. Co. v. La-Plante,* 480 U.S. 9, 16 n. 8, 107 S.Ct. 971, 976, n. 8, 94 L.Ed.2d 10 (1987). *Accord Texaco, Inc. v. Zah,* 5 F.3d 1374, 1376 (10th Cir.1993) (noting that, "as a matter of comity, a federal court should not exercise jurisdiction over cases arising under its federal question or diversity jurisdiction, if those cases are also subject to tribal jurisdiction, until the parties have exhausted their tribal remedies"). Thus, when the doctrine is applicable, a court may either dismiss a case or stay the action pending further tribal proceedings. *Altheimer & Gray,* 983 F.2d at 813.

Because the policies underlying the *Crow Tribe* and *Iowa Mutual* cases "seem broader than [the] narrow context" of jurisdictional challenges to tribal courts, several appellate courts "have applied the tribal exhaustion rule to cases in which there existed no first-filed court action." *Id.* at 814 (citing *Brown v. Washoe Hous. Auth.,* 835 F.2d 1327 (10th Cir.1988); *Weeks Constr., Inc. v. Oglala Sioux Hous. Auth.,* 797 F.2d 668 (8th Cir.1986)). "Indeed, the Ninth Circuit has suggested that the exhaustion rule applies mandatorily to all cases relating to tribal or reservation affairs." *Id.* (citing *Burlington Northern R.R. Co. v. Crow Tribal Council,* 940 F.2d 1239 (9th Cir.

*Accord Bank of Oklahoma v. Muscogee (Creek) Nation,* 972 F.2d 1166, 1170 (10th Cir.1992) (noting that the *Dry Creek II* exception "depended [ ] on the finding that no tribal forum existed for the non-Indian party"); *Warn v. Eastern Band of Cherokee Indians,* 858 F.Supp. 524, 527 (W.D.N.C. 1994) (finding that application of the *Dry Creek II* exception depended upon the prior exhaustion of all tribal remedies).

■ It is clear that Barker has not yet exhausted his Tribal remedies in this case. He has never brought an ICRA action before the Tribal Court, claiming that the Legislature violated his statutory due process rights under § 1302(8); as a result, we have no idea whether or not the Tribal Court would entertain this claim. Should the Tribal Court hear the merits of this claim, then Barker would be precluded from seeking federal court remedies pursuant to *Santa Clara* and *White*; if, however, the Tribal Court instead refuses to exercise jurisdiction over his ICRA claim, then Barker may arguably be able to advance such a claim in federal court under the policy reasons advanced in *Dry Creek II,* although the scope of this holding was significantly narrowed in *White* and has not been discussed by the Seventh Circuit. Because Tribal Court, rather than federal court, is the proper forum to hear Barker's statutory due process claim, the Court must dismiss this action.

Barker has expressed dissatisfaction with the sovereign immunity rules as applied to Indian tribes. As previously indicated, these rules are based on long-standing Supreme Court jurisprudence, and (from the best we can tell) are not the result of lobbying by Native–American constituencies or legislative favors. Nevertheless, the Supreme Court has recognized Congress' authority to limit this power, and it is to the legislative area that Barker should bring his complaints. As always, the Court expresses no opinion as to the cogency of his political views. Nevertheless, for the foregoing reasons, the Court hereby **DENIES** the plaintiff's Motion for Appointment of Counsel, **GRANTS** the defendants' Motions to Dismiss, and **DISMISSES** this case.

**SO ORDERED.**

1991)). The Seventh Circuit has observed, however, that:

"... even Circuits favoring a broad reading of the tribal exhaustion rule find it necessary to examine the factual circumstances of each case. This must be done in order to determine whether the issue in dispute is truly a reservation affair entitled to the exhaustion doctrine ...

The interpretation of another jurisdiction's laws, however, does not alone foreclose application of the tribal exhaustion rule. A tribal court, presumably, is as competent to interpret federal law as it is state law. *See Iowa Mutual,* 480 U.S. at 19, 107 S.Ct. at 978 (alleged incompetence of tribal courts not an exception to exhaustion requirement)."

*Altheimer & Gray,* 983 F.2d at 814 (finding that tribal exhaustion rule should not be applied where "there has been no direct attack on a tribal court's jurisdiction, there is no case pending in tribal court, [ ] the dispute does not concern a tribal ordinance as much as it does state and federal law," and the tribe has "explicitly agreed to submit to the venue and jurisdiction of federal and state courts"). *Accord Texaco,* 5 F.3d at 1378 (noting that "[w]hen the dispute involves non-Indian activity occurring outside the reservation, [ ] the policies behind the tribal exhaustion rule are not so obviously served"). Nevertheless, "[w]hen the activity at issue arises on the reservation, these policies almost always dictate that the parties exhaust their tribal remedies before resorting to the federal forum." *Id.* (characterizing the tribal exhaustion rule as "an inflexible bar to consideration of the merits of the petition by the federal court" when the dispute involves a "reservation affair"). In this case, employment relations within the Casino, created under Tribal authority for the economic betterment of the Tribal community, constitutes a "reservation affair" subject to the tribal exhaustion rule, *see Miller v. Coyhis,* 877 F.Supp. 1262, 1267 (E.D.Wis.1995) (Gordon, J.) (characterizing "the federal claims advanced by Mr. Miller, an Indian, [as] tribal matters—his termination by the Community from his position as the Community police chief"); this is especially true where the Casino is located on the reservation and the federal statute at issue, the ICRA, does not create federal court jurisdiction and *requires* Barker to bring his due process claim in Tribal Court. *See Santa Clara,* 436 U.S. at 58, 98 S.Ct. at 1677.