In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-1473

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

FRANK LONG,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01-CR-102—**Lynn Adelman**, *Judge.*

ARGUED SEPTEMBER 6, 2002—DECIDED MARCH 20, 2003

Before POSNER, EASTERBROOK, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* The narrow question in this case is whether Frank Long, a member of the Menominee Tribe of Wisconsin, can be prosecuted by the United States for the same conduct that was the subject of an earlier tribal prosecution. In order to resolve that issue, however, we must consider the scope of the sovereignty the Menominee Tribe currently enjoys. If the Menominee prosecution is properly characterized as one flowing from independent sovereign powers, then there is no Double Jeopardy bar to the subsequent federal prosecution. If, on the other hand, the Menominee were acting

solely under powers delegated by Congress, then the first prosecution will stand as a bar to the second.

This is a difficult question of first impression in a long line of cases dealing with Indian sovereignty beginning as early as the days of Chief Justice John Marshall.[1] The district court concluded that because the Tribe's powers were first eliminated, and then later restored by act of Congress, its prosecution of Long was undertaken as an arm of the federal government. It therefore dismissed the federal indictment in the present case, relying on the Fifth Amendment's Double Jeopardy Clause. We have come to the opposite conclusion about the source of authority that lay behind the Tribe's prosecution. In our view, the Tribe was exercising its own sovereign power, and thus the dual sovereignty exception to the Double Jeopardy Clause authorizes the sequential federal and tribal prosecutions. We therefore reverse the district court's decision and remand for further proceedings.

## I

In April 2001, defendant Long stole a pick-up truck on the Menominee Reservation in Keshena, Wisconsin, and crashed it into a tree. Both Long and the truck's owner are members of the Menominee Indian Tribe. Long was first convicted of theft and malicious mischief in a Menominee tribal court, which handed down a sentence of 120 days in tribal jail after he pleaded no-contest to the theft charge. At the behest of tribal authorities who were frustrated by Long's recidivism, a federal grand jury in the Eastern District of Wisconsin indicted Long for the

---

[1] Throughout this opinion, we use the term "Indian" rather than "Native American," reflecting the fact that both tradition, governing statutes and cases follow that practice.

same theft. Federal jurisdiction was premised on 18 U.S.C. § 1153(a), the Indian Major Crimes Act, which grants federal jurisdiction over fourteen enumerated crimes, including larceny, committed on Indian reservations by Indians. See also 18 U.S.C. § 661 (federalizing the crime of larceny within the United States's territorial jurisdiction).

Long moved to dismiss the federal indictment on double jeopardy grounds and alternatively asked that the court abstain from exercising jurisdiction. The magistrate judge recommended denying both aspects of his motion. The district court agreed in part, finding that the case did not warrant the extraordinary step of abstention, but it concluded that the subsequent federal prosecution violated the Double Jeopardy Clause, and for that reason it dismissed the indictment. The government has appealed, as is its right under 18 U.S.C. § 3731. The abstention ruling is not before us, as Long has not filed a cross-appeal from that aspect of the court's decision. We note, however, that a federal court generally may not choose to "abstain" from exercising its jurisdiction in a criminal prosecution.

## II

Although the post-colonial story of the Menominee Indians has been recounted in detail on numerous occasions, we find it useful for purposes of evaluating the arguments before us to review some of the high points. See, *e.g.*, *Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 452-53 (7th Cir. 1998) (discussing treaty history between Menominee Tribe and United States government); *Lac Courte Oreilles Band of Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 353-54 (7th Cir. 1983) (historical overview); *Sturdevant v. Wilber*, 464 F. Supp. 327, 328 (E.D. Wis. 1979) (discussing termination and restoration); *State v. Webster*, 338 N.W.2d 474, 476-77

(Wis. 1983) (discussing state jurisdiction over Menominee Tribe and reservation).

The Tribe's 276,000 acre reservation, located at the mouth of the Oconto and Wolf rivers in Wisconsin, was created by the Treaty of Wolf River in 1854. See *Menominee Indian Tribe*, 161 F.3d at 453; *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 405 (1968). The Tribe existed as a quasi-sovereign entity within the borders of its Indian reservation for nearly 100 years, during which time it exercised sovereign powers over internal reservation affairs. Among other things, the Menominee fully funded a hospital on the reservation and operated a sustainable yield logging business. See Patty Loew, *Indian Nations of Wisconsin*, 32-34 (2001). See also Felix S. Cohen, *Handbook of Federal Indian Law*, 231-35 (1982) (general discussion of tribal sovereignty over internal affairs). Of central importance to our case was the existence of a full-blown Menominee judicial system, which had jurisdiction over civil and criminal matters. Prior to the late 1800s, when the Bureau of Indian Affairs (BIA) established a Court of Indian Offenses on the Menominee Reservation, the Tribe operated a system of dispute resolution that was based on ancient practices involving a Peacemaker, or respected tribal elder. See Stephen M. Tourtillott-Grochowski, *Profile, Menominee Tribal Court,* in *On Common Ground: A Meeting of State, Federal and Tribal Courts* § 2 (Mar. 11-12 1999). The BIA Court of Indian Offenses that replaced the Menominee dispute resolution system employed Bureau-appointed judges and magistrates who applied Bureau-made rules and regulations. *Id.*

The BIA Court was abolished when jurisdiction over crimes committed on Menominee lands was transferred to the state of Wisconsin (discussed in further detail below), but that jurisdiction was restored in 1973 through a shift in federal law that paved the way for the re-establishment of the Court of Indian Offenses. That court re-

mained active until 1979 when the Tribe set up the Menominee Tribal Court. Tourtillot-Grochowski, *supra*. Today, the Menominee Tribal Court is comprised of a Supreme Court with three sitting Justices, as well as two lower courts presided over by two trial judges. *Id*. The combined system processed nearly 7,000 cases in 1997. *Id*.

### III

Our review of the dismissal of Long's federal indictment under the Double Jeopardy Clause is *de novo*. *United States v. Furlett*, 974 F.2d 839, 842 (7th Cir. 1992). It is apparent that this case raises complex questions about the scope of the Double Jeopardy Clause, tribal sovereignty, and Congress's power to regulate Indian tribes. Together, these points add up to an interesting question of first impression for this court, namely, whether successive prosecutions by an Indian tribal court and the federal government fall within the dual sovereignty exception to the Double Jeopardy Clause if the tribal prosecution is undertaken by a tribe that was the subject of an Act of Congress terminating federal supervision over the property and members of the tribe, and whose powers were later legislatively restored. The Supreme Court expressly declined to address this question in *United States v. Wheeler*, 435 U.S. 313 (1968), where it issued the following disclaimer:

> By emphasizing that the Navajo Tribe never lost its sovereign power to try tribal criminals, we do not mean to imply that a tribe which was deprived of that right by Act of Congress would necessarily be an arm of the Federal Government. That interesting question is not before us, and we express no opinion thereon.

435 U.S. at 329 n.28. In fact, until this case, this precise question had not been decided by any court.

### A.  The Dual Sovereignty Doctrine

The Fifth Amendment's Double Jeopardy Clause states that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Supreme Court has interpreted the clause as prohibiting not only multiple punishments for the same crime, but also multiple prosecutions as well. See *United States v. Dixon*, 509 U.S. 688, 695-96 (1993). One significant limitation exists, however, to the protection afforded by the Double Jeopardy Clause. It is known as the dual sovereignty doctrine, under which courts recognize that the Clause is no bar to serial prosecution and punishment undertaken by separate sovereign entities. *Heath v. Alabama*, 474 U.S. 82, 88 (1985). As the Supreme Court in *Heath* explained,

> [T]he dual sovereignty doctrine is founded on the common-law conception of crime as an offense against the sovereignty of the government. When a defendant in a single act violates the "peace and dignity" of two sovereigns by breaking the laws of each, he has committed two distinct "offences."

*Id.* at 88.

In analyzing whether sequential prosecutions are undertaken by separate sovereign bodies, courts must determine whether the prosecuting "entities draw their authority to punish the offender from distinct sources of power." *Id.* A classic application of the dual sovereignty doctrine is the case of successive prosecutions by a state and the federal government. In *United States v. Lanza*, 260 U.S. 377 (1922), the Supreme Court concluded that separate prosecutions under the National Prohibition Act and state law did not violate the Double Jeopardy Clause because the federal government's power to regulate intoxicating liquors was derived from the Eighteenth Amendment whereas the state's regulatory power was among

those powers reserved to the states by the Tenth Amendment. *Id.* at 382.

Prosecutions by Indian tribes and the federal government are prosecutions by separate sovereigns for purposes of the Double Jeopardy Clause. See *Wheeler*, 435 U.S. at 328. The Court's decision in *Wheeler* reaffirmed the dual sovereignty doctrine and its applicability to Indian tribes. The Court reasoned that a tribe's power to prosecute Indian offenders for crimes committed on tribal lands was not derived from the federal government, because such powers were not among the sovereign powers that the tribes lost when they initially submitted to the United States's jurisdiction. *Id.* at 326.

The unresolved question in this case is whether the dual sovereignty exception to the Double Jeopardy Clause applies to those Indian tribes that were first "terminated" and then "restored" by act of Congress. (Put otherwise, the question is what was "terminated"—certain powers of the tribe, or the sovereign existence of the tribe itself.) If the restored tribes continue to exercise criminal jurisdiction over tribal lands as a function of the inherent sovereign powers that they retained even after formally submitting to the United States's ultimate sovereignty, then the dual sovereignty doctrine insulates tribal prosecutions and subsequent federal prosecutions (and vice versa) from double jeopardy challenges. If, however, congressional termination indeed cut off the Indian tribes' inherent sovereign powers then the question becomes whether restoration by act of Congress also restores the tribes' inherent sovereign powers or merely exercises a delegation of federal power to pursue criminal prosecutions to the tribes. If the latter view is correct, then sequential tribal and federal prosecutions both represent an exercise of the same sovereign's power, and thus would violate the Double Jeopardy Clause.

**B.  The Tribal Sovereignty Doctrine**

The Supreme Court has long recognized that Indian tribes occupy a unique place in the American system of government. See *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831). Although at one time they may have had the status of independent nations, they lost their full independence by virtue of their conquest first by European and then by American colonizers—a loss that was later ratified by treaties. Indian tribes are nonetheless viewed as quasi-independent or domestic dependent nations within the United States. *Id.*

As the Court's partner in setting the boundaries of retained tribal authority, Congress enjoys plenary powers over Indian affairs. See *Winton v. Ames*, 255 U.S. 373, 393 (1921). Congress derives this power "both explicitly and implicitly from the Constitution itself." *Morton v. Mancari*, 417 U.S. 535, 551-52 (1974). Courts have attributed Congress's plenary powers over Indian relations to the Indian Commerce Clause, which grants Congress the power to "regulate Commerce . . . with the Indian Tribes," see, *e.g.*, *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989) ("[T]he central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs."), and to Congress's protectorate or trust relationship with the Indian tribes, see *United States v. Kagama*, 118 U.S. 375, 383-84 (1886). Others have claimed that these plenary powers exist by virtue of conquest. See Judith Resnick, *Dependent Sovereigns: Indian Tribes, States, and the Federal Courts*, 56 U. Chi. L. Rev. 671, 692 (1989). Either way, it is clear that Indian tribes retain the powers of a sovereign nation in the limited realm of internal affairs, subject to Congress's power completely to divest the tribes of such sovereignty. See *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987); *Smart v. State Farm Ins. Co.*, 686 F.2d 929, 932 (7th Cir. 1989).

Indian tribes' retained sovereignty over internal affairs is justified in light of the tribes' legitimate interest in "control[ling] their own internal relations, and [ ] preserv[ing] their own unique custom and social order." *Duro v. Reina*, 495 U.S. 676, 686 (1990). Such powers were not necessarily destroyed when the Indian tribes submitted to the jurisdiction of the United States. *Id.* The power to make and enforce criminal laws has been recognized as an exercise of the inherent sovereign powers retained by Indian tribes because the exercise of criminal jurisdiction over tribe members on tribal lands "involve[s] only the relations among members of a tribe [and these] are not such powers as would necessarily be lost by virtue of a tribe's dependent status." *Wheeler*, 435 U.S. at 326.

### C.  The Sovereign Powers of the Menominee Tribe

Central to the Supreme Court's reasoning in *Wheeler* is the distinction between sovereign powers that Indian tribes retain despite their conquest by the United States and those powers that are delegated to the tribes by act of Congress. *Id.* The source of the Tribe's powers here is debatable because of a series of congressional acts that altered the Menominee's status as an Indian tribe. Three statutes are relevant: Public Law 280, codified in part at 18 U.S.C. § 1162; the Menominee Termination Act, 25 U.S.C. §§ 891-902; and the Menominee Restoration Act, 25 U.S.C. §§ 903-903f.

In August 1953, in response to perceived lawlessness on Indian reservations, the United States Congress enacted Public Law 280, 67 Stat. 588 (1953), codified in part at 18 U.S.C. § 1162, which gave six states (Alaska, California, Minnesota, Nebraska, Oregon and Wisconsin) jurisdiction to prosecute "crimes committed by or against Indians in Indian country." *Webster*, 338 N.W.2d at 476; see also 18 U.S.C. § 1162 ("[T]he criminal laws of such state

or territory shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory."). While Wisconsin was among the states initially covered by Public Law 280, the original statute specifically exempted the Menominee Tribe, which lobbied for this exception because it claimed to have an effective tribal system of justice in place at the time. *Menominee Tribe of Indians*, 391 U.S. at 411 n.11.

Just one year later, pursuant to a federal policy of assimilation that existed at the time, Congress enacted the Menominee Termination Act, Pub. L. No. 399, 68 Stat. 250, codified at 25 U.S.C. §§ 891-902 (1953). The Menominee Termination Act aimed to "provide for the orderly termination of Federal supervision over the property and members of the Menominee Indian Tribe of Wisconsin." *Menominee Tribe of Indians*, 391 U.S. at 408. As defined by the Act, termination meant that

> [A]ll statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.

*Pyatskowit v. Montour*, 240 N.W.2d 186, 186-87 (Wis. 1976). The question here, as we said, is whether this statute simply terminated the external indicia of tribal status for the Menominee, or whether it permanently changed the Tribe's inherent sovereign powers.

In *Menominee Tribe of Indians v. United States*, the Supreme Court explained that the Termination Act caused the federal government to cede to the State of Wisconsin "its power of supervision over the tribe and the reservation lands." 391 U.S. at 412. The Court declined to read into the statutory language an abrogation of the Menominee Indians' hunting and fishing rights that were

protected by treaty because the Termination Act spoke only of "the orderly termination of Federal supervision over the property and members of the tribe." *Id.* at 412-13. Similarly, the Supreme Court of Wisconsin in *State v. Webster,* held that the Menominee Termination Act did not extinguish the Tribe's property interest in reservation lands over which a right-of-way had been granted to the state. 338 N.W. 2d at 480. Explaining that the Act restored to the Menominee Tribe "ownership of its tribal lands" while at the same time subjecting the Tribe "to the state's criminal and civil jurisdiction," *id.* at 477, the Wisconsin Supreme Court necessarily contemplated the continued existence of the Menominee Tribe as a quasi-sovereign entity (with title to its tribal lands) post-"termination." *Id.*

Indeed, the survival of the Menominee Tribe in some sovereign capacity after the Termination Act is an uncontroversial proposition. As the United States Court of Claims explained: "The Termination Act did not abolish the *tribe* or its membership. It merely terminated Federal supervision over and responsibility for the property and members of the tribe. The Menominee Indians continue to constitute a tribe." *Menominee Tribe of Indians v. United States*, 388 F.2d 998, 1000 (Ct. Cl. 1967) (emphasis added).

Two months after the Termination Act was enacted, Congress amended Public Law 280 to extend the State of Wisconsin's jurisdiction to cover crimes committed by or against Indians on the Menominee Reservation. See *Webster*, 338 N.W.2d at 476; see also 18 U.S.C. § 1162(a) (codifying Pub. L. No. 661, 68 Stat. 795 (1954)). Even if the Menominee Termination Act did not divest the Tribe of its inherent sovereign powers in every regard, together with Public Law 280 (as amended), Congress withdrew Menominee jurisdiction over reservation crimes. 18 U.S.C. § 1162. This spelled the end of the responsibilities of the

BIA Court of Indian Offenses for the Menominee Reservation; jurisdiction over all matters was transferred to the Wisconsin state court system. See Tourtillot-Grochowski, *supra*.

The policy of "termination" was not to be the last word in federal-tribal relations, however. In 1973, Congress reversed course again when it enacted the Menominee Restoration Act, 25 U.S.C. §§ 903-903f, which repealed the Menominee Termination Act. See *Latender v. Israel*, 584 F.2d 817, 820 (7th Cir. 1978). The Menominee Restoration Act repudiated the federal policy of assimilation and restored the Tribe's pre-"termination" rights.

While Public Law 280 was never repealed, the State of Wisconsin, consistent with Congress's later intent as expressed by the Menominee Restoration Act (and after Tribe lobbying), retroceded its criminal jurisdiction over the Menominee Reservation back to the federal government on March 1, 1976; the federal government from that point forward exercised concurrent jurisdiction with the Menominee over the crimes covered by the Major Crimes Act. See *Latender*, 584 F.2d at 818. See also Lowe, *supra*, Indian Nations of Wisconsin at 38 (Menominee Reservation is the only Wisconsin Indian Reservation over which the state retroceded its criminal jurisdiction.). The Menominee Restoration Act, for its part, makes clear that Congress intended to eliminate termination as a policy and practice and to restore the Menominee Tribe to its pre-"termination" status. 25 U.S.C. § 903a(b) ("[T]here are hereby reinstated all rights and privileges of the tribe or its members under Federal treaty, statute, or otherwise.").

Courts have construed the Restoration Act to effect a full restoration of the Menominee Tribe's pre-Termination Act powers. For example, in *Barker v. Menominee Nation Casino*, 897 F. Supp. 389, 394 (E.D. Wis. 1997), a post-restoration case, the district court found "no evidence

in the record that the Tribe has waived its sovereign immunity" in a suit brought by a former employee of a Menominee casino. If the Tribe's sovereign immunity remained intact post-restoration (and we have no quarrel with that conclusion), then we can think of no reason why the Tribe's criminal jurisdiction should not as well. See also *Webster*, 338 N.W.2d at 480. But our concern here goes beyond whether Congress successfully restored the Menominee Tribe's criminal jurisdiction. It is clear that it did. For purposes of the dual sovereignty exception, we must also be satisfied that Congress did so not by delegating federal power to exercise criminal jurisdiction to the Tribe (assuming that such a delegation to a different entity would be possible), but instead by restoring the Tribe's own sovereign powers, which pre-dated the Termination Act, to exercise criminal jurisdiction.

The fact that the Restoration Act uses the word "reinstated" to describe the congressional action is one piece of evidence in favor of the "restoration" reading and against the "delegation" reading. Congress had not delegated any power to the Tribe before the Termination Act, and thus there was nothing from Congress that could have been reinstated. History also supports the conclusion that the Menominee Tribe's criminal jurisdiction over certain reservation crimes existed before and exists again as a function of the Tribe's inherent sovereign powers. This case does not involve a people unknown to history before Congress intervened. The Menominee Tribe inhabited the state of Wisconsin long before European explorers reached North American shores. In fact, the Menominee "are the oldest known continuous residents in Wisconsin." Nancy Oestreich Lurie, *Wisconsin Indians* 10 (2002). Their history is rich and their retained sovereign rights—though admittedly held at the sufferance of Congress—cannot be disregarded. The most reasonable reading of the Restoration Act is as an effort by Congress to place the

Menominee back in the position they held before the Termination Act. Any other result would place the Menominee on different footing than those tribes newly recognized by Congress, as well as those tribes that by chance were spared the termination experiment. (There are currently about 550 federally recognized Indian tribes. Approximately 110 tribes and bands were terminated in various acts by Congress. See Michael C. Walch, Note, 35 Stan. L. Rev. 1181, 1186 (1983).) We see no sense to such a distinction. And while we assume that Congress neither can nor would confer the status of a tribe onto a random group of people, we have no doubt about congressional power to recognize an ancient group of people for what they are.

It is worth noting that our case does not involve the same question that was before the Ninth Circuit in *United States v. Enas*, 255 F.3d 662 (9th Cir. 2001) (*en banc*) and the Eighth Circuit in *United States v. Weaselhead*, 156 F.3d 818 (8th Cir.), vacated by equally divided court, 165 F.3d 1209 (8th Cir. 1998) (*en banc*). In *Enas* and *Weaselhead*, the issue was whether Congress could *create* inherent sovereign powers that the Supreme Court had earlier concluded Indian tribes did not possess. The Ninth Circuit concluded that it was within Congress's powers to do so, 225 F.3d at 675, while the Eighth Circuit split evenly on this question. 165 F.3d 1209. Our case does not involve creation of any new "inherent" rights. In the Menominee Restoration Act, Congress merely sought to restore to the Menominee that which it had taken from the Tribe earlier.

Our conclusion that Congress had the power to undo by legislation that which it had accomplished by legislation—restoring to the Menominee the inherent sovereign power that it took from them in 1954—is consistent with the general rule about congressional power. The Supreme Court has long recognized that "the will of a

particular Congress . . . does not impose itself upon those to follow in succeeding years." *Reichelderfer v. Quinn*, 287 U.S. 315, 318 (1932), citing *Newton v. Mahoning County Comm'rs*, 100 U.S. 548, 559 (1879), and *Connecticut Mut. Life Ins. Co. v. Spratley*, 172 U.S. 602, 621 (1899). Contracts with the government or acts creating vested rights in private parties raise different concerns, see *United States v. Winstar Corp.*, 518 U.S. 839, 871, 876 (1996), but we do not have that type of legislation before us. The text of the Menominee Restoration Act shows that the later Congress was exercising its legislative prerogative to undo the effects of the earlier Termination Act. This is somewhat like what Congress does when it exercises its power to confer jurisdiction on the lower federal courts. Congress's plenary power over the lower federal courts under Article III, § 1 of the Constitution is comparable to its plenary power over Indian affairs. As the Supreme Court explained: "That body [Congress] may give, withhold or restrict such jurisdiction at its discretion, provided it be not extended beyond the boundaries fixed by the Constitution." *Kline v. Burke Constr. Co.*, 260 U.S. 226, 234 (1922) (discussing the Anti-Injunction Act). Just as Congress can create, deny or limit the jurisdiction of the lower federal courts, so too can it terminate various indicia of Indian sovereignty, and then later restore those powers, without affecting the fundamental existence of the tribe.

Finally, there are strong policy considerations in support of our conclusion. As the Menominee Tribe argued in its *amicus curiae* brief to this court, federal and tribal law enforcement officials often pursue different objectives when prosecuting Menominee offenders. Vandalizing a burial site is one example where federal and tribal objectives likely diverge; for the Tribe, this is a serious offense implicating religious and cultural concerns that federal prosecutors do not share. By applying the dual

sovereignty exception, the Tribe is free to vindicate its unique law enforcement objectives without implicating the Double Jeopardy Clause. Likewise, the federal government is legitimately concerned with prosecuting tribal offenders for serious reservation crimes, in part because tribal punishments are limited by the Indian Civil Rights Act, 25 U.S.C. § 1302(7), which prevents Indian tribes from imposing penalties in excess of $5,000 or one year imprisonment. If the dual sovereignty exception does not apply, Menominee authorities must wait for federal prosecutors to act against the most egregious reservation offenders because any initial tribal prosecution would prevent subsequent federal prosecution and automatically cap the punishment to that allowed by the Indian Civil Rights Act. Neither tribal nor federal law enforcement objectives should be frustrated in this way.

## IV

For the foregoing reasons, the judgment of the district court is REVERSED and the case is REMANDED for reinstatement of the federal indictment and further proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*