**2026 WI 21**

# Supreme Court of Wisconsin



LEGEND LAKE PROPERTY OWNERS ASSOCIATION, INC.,
*Plaintiff-Appellant*,

*v.*

GUY KESHENA, et al.,
*Defendants-Respondents*.

No. 2022AP937
Decided June 23, 2026

APPEAL from a judgment and order of the Menominee County
Circuit Court (Katherine Sloma, J.) No. 2018CV7

SUSAN M. CRAWFORD, J., delivered the majority opinion of the Court, in which JILL J. KAROFSKY, C.J., and REBECCA FRANK DALLET and JANET C. PROTASIEWICZ, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ANNETTE KINGSLAND ZIEGLER, J., joined. BRIAN K. HAGEDORN, J., filed a dissenting opinion in which ANNETTE KINGSLAND ZIEGLER and REBECCA GRASSL BRADLEY, JJ., joined.

¶1 SUSAN M. CRAWFORD, J. "Indian tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978) (quoting *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832)). Tribal "sovereignty predates the formation of the United States and persists unless diminished by federal law." COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 1.01, at 2 (Nell Jessup Newton & Kevin K. Washburn, eds., 2024) [hereinafter COHEN'S HANDBOOK]. Tribes have sovereign immunity from suit as "a necessary corollary to Indian

sovereignty and self-governance." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 393 (2023) (citation modified).

¶2      This case requires this court to resolve a dispute about the scope of tribal sovereign immunity from suit in a Wisconsin state court. A group of private landowners—the Legend Lake Property Owners Association (the Association)—brought suit in Wisconsin state court against the Menominee Indian Tribe of Wisconsin (the Tribe) and one of its members, Guy Keshena, in an effort to restrict use of land historically inhabited by the Tribe and now held in trust by the federal government on the Tribe's behalf. The Tribe and Keshena assert that tribal sovereign immunity bars the suit.

¶3      This case comes before us on certification from the court of appeals. We hold that the Tribe is immune from suit and that its immunity likewise extends to Keshena. We conclude that nothing abrogates, waives, or otherwise precludes the Tribe's sovereign immunity in this case. Accordingly, we affirm the circuit court's judgment of dismissal.

## I.  BACKGROUND

¶4      The Menominee Indians "are the oldest known continuous residents in Wisconsin," *United States v. Long*, 324 F.3d 475, 482 (7th Cir. 2003) (quoting another source), once occupying over 10 million acres of land in what is now Wisconsin and the Upper Peninsula of Michigan.[1] After ceding rights to most of its land in a series of treaties, the Tribe in 1854 entered the Treaty of Wolf River with the United States. *Van Camp v. Menominee Enters.*, 68 Wis. 2d 332, 334, 228 N.W.2d 664 (1975). The treaty established the Menominee Reservation of approximately 234,000 acres, comprised mostly of what is now Menominee County, *id.*, as a "permanent home" for the Tribe. Treaty of Wolf River, Menominee Indian Tribe of Wis.-U.S., May 12, 1854, 10 Stat. 1064. One hundred years later, in 1954, the federal government terminated its recognition of the Tribe's status through the Menominee Indian Termination Act "pursuant to a federal policy of assimilation that existed at the time." *Long*, 324 F.3d at

---

[1] *See generally* Brian Kowalkowski, *Menominee Indian Tribe of Wisconsin Facts and Figures Reference Book* 2, 47 (2004), https://www.menominee-nsn.gov/CulturePages/Documents/FactsFigureswithSupplement.pdf (providing estimate of land historically occupied by the Tribe).

480; *see* Pub. L. No. 399, 68 Stat. 250 (1954) (formerly codified at 25 U.S.C. §§ 891–902) [hereinafter Termination Act]. "[T]he Termination Act caused the federal government to cede to the State of Wisconsin 'its power of supervision over the tribe and the reservation lands.'" *Long*, 324 F.3d at 481 (quoting *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 412 (1968)). Terminating federal recognition meant, among other things, that the United States would no longer hold the reservation land in trust for the Tribe and that the property would be subject to taxation. Termination Act §§ 8, 9.

¶5 Pursuant to the Termination Act, the Tribe created Menominee Enterprises, Inc. (MEI) to take title to tribal property formerly held in trust.[2] In the face of financial duress, MEI subsequently sold thousands of acres of its former reservation land to nontribal members, including the land purchased for the Legend Lake development.[3] The developer of Legend Lake established the Association in 1972. Membership in the Association was mandatory for all owners of lots in the Legend Lake development.

¶6 In 1973, Congress repealed the Termination Act and restored federal recognition of the Tribe through the Menominee Restoration Act. *See* Pub. L. No. 93-197, 87 Stat. 770 (1973) (formerly codified at 25 U.S.C. §§ 903–903g) [hereinafter Restoration Act]. The Restoration Act "reinstated all rights and privileges of the tribe or its members under Federal treaty, statute, or otherwise which may have been diminished or lost pursuant to [the Termination Act]." *Id.* § 3(b); *see also Long*, 324 F.3d at 482 (the Restoration Act "makes clear that Congress intended . . . to restore the Menominee Tribe to its pre-'termination' status"). The Restoration Act provided a mechanism for the Tribe to reacquire its lost reservation lands, directing the Secretary of the Interior to "accept the real property (. . . in or adjacent to . . . the county of Menominee, Wisconsin) of members of the

---

[2] *See* Termination Act § 8 ("[I]f the Tribe obtains a charter for a corporation . . . for the purpose . . . of taking title to all tribal lands and assets and enterprises owned by the tribe or held in trust by the United States for the tribe, and requests such transfer to be made to such corporation . . . the Secretary [of the Interior] shall make such transfer . . . .").

[3] This history is recounted in detail in Joseph F. Preloznik & Steven Felsenthal, *The Menominee Struggle to Maintain Their Tribal Assets and Protect Their Treaty Rights following Termination*, 51 N.D. L. REV. 53, 64–68 (1974).

Menominee Tribe, but only if transferred to him by the Menominee owner or owners." Restoration Act § 6(c). It directed that real property transferred to the Secretary "shall be taken in the name of the United States in trust for the Menominee Tribe of Wisconsin and shall be part of their reservation," and "exempt from all local, State, and Federal taxation." *Id.*

¶7 In 1998, the Menominee Tribal Legislature passed a resolution allowing the Tribal Chairman to designate a tribal member to acquire title to real property for the purpose of placing it in trust with the United States; the Tribal Chairman designated Keshena as that member. The Association amended its bylaws that same year, and again in 2001 and 2009, adding additional restrictive covenants to the Legend Lake parcels. These restrictions were plainly aimed at preventing the Tribe from reacquiring its former reservation lands that were now part of the Legend Lake development. In addition to prohibiting any transfer to a "sovereign or dependent sovereign nation" or the placement of any property into federal trust, the 2009 amendments prohibited transfers that would remove any property from the county tax rolls, exempt property from real estate taxes, or remove property from county zoning authority or the jurisdiction of the state, among other restrictions. The amendments specified the venue for actions to enforce the restrictive covenants as the Menominee County Circuit Court and purported to waive any sovereign immunity defense by a purchaser or transferee of land in such an action.

¶8 In 2017, Keshena acquired title to more than 30 lots within the Legend Lake development (the Keshena lots) for and on behalf of the Tribe. Two separate legal proceedings commenced. In March and May of 2018, Keshena submitted an application to the federal Bureau of Indian Affairs (BIA) requesting the United States to take title to the Keshena lots and hold the land in trust for the Tribe. In October 2018, the Association filed this lawsuit in the Menominee County Circuit Court, seeking a declaration that: (1) the 2009 restrictive covenants were valid and legally enforceable, (2) the 2009 restrictive covenants applied to the Keshena lots, and (3) any transfers in violation of the 2009 restrictive covenants were null and void. A few weeks later, the BIA determined that the Restoration Act mandated the United States' acquisition of the Keshena lots and published a notice of intent to accept the Keshena lots into trust. The Association notified the Interior Board of Indian Appeals (IBIA) of its intent to appeal the BIA decision.

¶9     In March 2019, the Menominee County Circuit Court denied the Tribe's motion to dismiss the present action. Later, in April 2022, the circuit court granted the Tribe's motion for reconsideration and dismissed the case because the Restoration Act preempted the restrictive covenants or, alternatively, because tribal sovereign immunity barred the suit. The Association appealed.

¶10     While the Association's state court appeal was pending, its appeal of the BIA's decision to place the Keshena lots in trust continued. In March 2023, the IBIA affirmed the BIA's decision and found that the 2009 restrictive covenants were preempted by the Restoration Act. *Legend Lake Prop. Owners Ass'n v. Midwest Reg'l Dir., Bureau of Indian Affs.*, 68 Interior Dec. 284 (IBIA 2023). The Association sought judicial review of the IBIA decision in federal district court. The United States District Court for the Eastern District of Wisconsin granted the Tribe's motion to dismiss, also on grounds that "the Association's restrictive covenants that purport to bar the trust acquisitions" were preempted by the Restoration Act. *Legend Lake Prop. Owners Ass'n v. U.S. Dep't of the Interior*, No. 23-C-480, 2024 WL 449287, at *5 (E.D. Wis. Feb. 6, 2024). The district court declined to address the Association's claims that the remaining restrictive covenants are not preempted and are valid and enforceable. *Id.* at *6. The Keshena lots were conveyed to the United States in March and April of 2023.

¶11     The court of appeals ordered the parties to file supplemental briefs addressing the effect of the federal litigation on this case. The Association clarified that it still sought a declaration of the enforceability of certain provisions of the 2009 restrictive covenants. The Association argued that the so-called "non-transfer" provisions in article (1)(D) of the 2009 restrictive covenants require the Keshena lots to remain subject to "municipal and Association laws, rules, regulations and obligations, in rem, notwithstanding a transfer to an owner not otherwise subject to them."[4] Through this provision, the Association argues that its bylaws—

---

[4] As part of its supplemental briefing to the court of appeals, the Association argued that parts of article (1)(B) of the 2009 restrictive covenants are also "non-transfer" provisions. In response, the Tribe argued that article (1)(B) specifically prohibits the transfer of lands into trust. Likewise, in the federal litigation, the IBIA specifically identified article (1)(B) as a provision restricting transfer. As such, the court of appeals correctly narrowed the inquiry to article (1)(D) in its certification. The Association also stated that it no longer sought to enforce the provisions of the 2009 restrictive covenants "related to future taxation

which include extensive use restrictions and provide for the collection of Association dues and assessments—are also binding on the Tribe.[5]

¶12    On January 22, 2025, the court of appeals certified the Association's appeal to this court, pursuant to WIS. STAT. § (Rule) 809.61 (2023–24).[6] In its certification, the court of appeals noted that this case raises novel questions regarding tribal sovereign immunity and federal preemption.

## II.  ANALYSIS

¶13    We independently review the circuit court's order dismissing this case. *See Pool v. City of Sheboygan*, 2007 WI 38, ¶9, 300 Wis. 2d 74, 729 N.W.2d 415; *see also DNR v. Timber & Wood Prods. Located in Sawyer Cnty.*, 2018 WI App 6, ¶17, 379 Wis. 2d 690, 906 N.W.2d 707 (Ct. App. 2017).

¶14    The parties dispute whether tribal sovereign immunity bars this suit and whether the United States is an indispensable party.[7] The Tribe and Keshena raised tribal sovereign immunity in their first

---

of the parcels." The federal district court ruled that the Restoration Act precluded enforcement of the provisions that prohibited the removal of the parcels from the county tax rolls. *See Legend Lake Prop. Owners Ass'n v. U.S. Dep't of the Interior*, No. 23-C-480, 2024 WL 449287, at *5 (E.D. Wis. Feb. 6, 2024).

[5] The Association's bylaws restrict use to "single family residential and for the sole use of the owner" and largely prohibit use for commercial purposes. The bylaws include detailed requirements for the size, height, and design of residential structures and restrict the alteration of lot lines, construction of non-residential structures, cutting of trees, camping, and erecting of fencing, among other limitations.

[6] All subsequent references to the Wisconsin Statutes are to the 2023–24 version unless otherwise indicated.

[7] The parties also dispute whether the Restoration Act preempts the 2009 restrictive covenants, whether the controversy is ripe for review, whether the "non-transfer" provisions of the 2009 restrictive covenants are severable from the transfer provisions, and whether the restrictive covenants are valid under WIS. STAT. § 706.02(1).

responsive pleading in the circuit court and reassert that argument in this court. They argue for the first time here that the United States is an indispensable party, given that the United States now holds title to the Keshena lots. At bottom, the Tribe and Keshena want this lawsuit dismissed. For its part, the Association argues that neither sovereign immunity nor the United States' absence prevent this suit from proceeding.

¶15    Courts have discretion "to choose among threshold grounds for denying audience to a case on the merits." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999); *see Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) ("As one sufficient ground for support of the judgment has been declared, there is no need to discuss the others urged."). Because it is a jurisdictional bar, sovereign immunity is one such ground that prevents review of the merits. *See Lister v. Bd. of Regents of Univ. of Wis. Sys.*, 72 Wis. 2d 282, 296, 240 N.W.2d 610 (1976) ("This court has held that sovereign immunity is a matter of personal jurisdiction . . . ."); *see also Douglas Indian Ass'n v. Cent. Council of Tlingit and Haida Indian Tribes of Alaska*, 403 P.3d 1172, 1177 n.16 (Alaska 2017) (collecting federal cases in which tribal sovereign immunity was properly invoked as a jurisdictional bar). We conclude that this lawsuit is jurisdictionally barred on grounds of tribal sovereign immunity. Accordingly, we need not address the parties' remaining arguments.[8]

---

[8] The dissenting justices would not reach this threshold jurisdictional issue, but would instead remand this case to the circuit court to address whether the United States is an indispensable party. That approach presents two problems. First, this court "has not viewed the requirement of joinder of indispensable parties as jurisdictional." *Heifetz v. Johnson*, 61 Wis. 2d 111, 122, 211 N.W.2d 834 (1973). Jurisdictional matters take priority. "In order for a court to exercise its power over a case, it must have both subject matter jurisdiction and personal jurisdiction." *In re Int. of A.E.H.*, 161 Wis. 2d 277, 297, 468 N.W.2d 190 (1991); *see also* WIS. STAT. § 801.04(2) (stating that a court may render judgment against a party personally only if personal jurisdiction exists); WIS. STAT. § 801.08(1) ("All issues of fact and law raised by an objection to the court's jurisdiction over the person or property . . . shall be heard by the court . . . in advance of any issue going to the merits of the case."). Second, the circuit court has already ruled that it lacks jurisdiction over the Tribe on grounds of sovereign immunity. Remanding this case to the circuit court without addressing this jurisdictional question would generate uncertainty as to the circuit court's jurisdiction on remand, needlessly prolong litigation that has already lasted more than seven years, and delay the inevitable result this court reaches today.

¶16    We turn first to our analysis of why sovereign immunity protects the Tribe from the Association's lawsuit, then address why the Association cannot maintain its lawsuit against Keshena either.

## A. TRIBAL SOVEREIGN IMMUNITY

¶17    "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991) (quoting *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831)); *see also Teague v. Bad River Band of Lake Superior Tribe of Chippewa Indians*, 2000 WI 79, ¶21, 236 Wis. 2d 384, 612 N.W.2d 709 ("Indian tribes are separate sovereigns under federal law."). "Among the core aspects of sovereignty that tribes possess . . . is the 'common-law immunity from suit traditionally enjoyed by sovereign powers.'" *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *Santa Clara Pueblo*, 436 U.S. at 58). "[T]ribal immunity is a matter of federal law." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 759 (1998). Its scope is broad: "Tribes enjoy immunity whether they act within or outside tribal lands, for commercial or classically governmental purposes, and without regard to whether their actions are otherwise subject to state jurisdiction." COHEN'S HANDBOOK § 8.04[2][a], at 542. Nonetheless, Congress may abrogate a tribe's immunity, and a tribe may waive its own immunity. *Bay Mills Indian Cmty.*, 572 U.S. at 788–89.

¶18    In this case, the Association argues that Congress abrogated the Tribe's sovereign immunity by passing the Restoration Act and that the Tribe waived its immunity in a number of different ways. Alternatively, the Association posits that either an "in rem" exception or a common law "immovable property" exception to tribal sovereign immunity provides a basis for state court jurisdiction over its claims. For the reasons articulated below, the Tribe's sovereign immunity was neither abrogated by Congress nor waived by the Tribe. We also decline to recognize that either of the proposed exceptions to tribal sovereign immunity provides a basis for jurisdiction.

### 1. Abrogation

¶19    The Association first argues that the Restoration Act abrogates the Tribe's sovereign immunity for the purpose of adjudicating "valid existing rights" with respect to the Keshena lots transferred to the

United States. The Association relies primarily on Section 6(c),[9] which permits tribal members to transfer land to the United States to hold in trust as part of the Tribe's reservation. That section reads in part:

> Such property shall be subject to all valid existing rights including, but not limited to, liens, outstanding taxes (local, State, and Federal), mortgages, and any other obligations. The land transferred to the Secretary [of the Interior] pursuant to this subsection shall be subject to foreclosure or sale pursuant to the terms of any valid existing obligation in accordance with the laws of the State of Wisconsin.

Restoration Act § 6(c). The Tribe and Keshena argue that Congress did not abrogate the Tribe's sovereign immunity because the Restoration Act contains no clear statement doing so and abrogation may not be implied. We agree with the Tribe and Keshena, and we reject the Association's invitation to disregard established legal principles relating to abrogation.

¶20 "To abrogate sovereign immunity, Congress must make its intent unmistakably clear in the language of the statute." *Lac du Flambeau*, 599 U.S. at 387 (citation modified). This "standard for finding a congressional abrogation is stringent." *Fin. Oversight & Mgmt. Bd. for P.R. v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 346 (2023). The U.S. Supreme Court has "repeatedly emphasized that tribal sovereign immunity, absent a clear statement of congressional intent to the contrary, is the 'baseline position.'" *Lac du Flambeau*, 599 U.S. at 387 (quoting *Bay Mills Indian Cmty.*, 572 U.S. at 790). There "is not a magic-words requirement, however." *Id.* at 388. Rather, "[t]he clear-statement question is simply whether, upon applying 'traditional' tools of statutory interpretation, Congress's abrogation of tribal sovereign immunity is 'clearly discernable' from the statute itself." *Id.* (quoting *FAA v. Cooper*, 566 U.S. 284, 291 (2012)).

---

[9] In its briefs, the Association also cites Restoration Act § 3(d), which provides "[e]xcept as specifically provided in this Act, nothing contained in this Act shall alter any property rights or obligations, any contractual rights or obligations, including existing fishing rights, or any obligations for taxes already levied." The Association makes no independent argument as to why § 3(d) abrogates the Tribe's sovereign immunity. Accordingly, we assume its argument mirrors the argument it makes under § 6(c): that preserving a right implies a right to sue.

¶21    The United States Supreme Court most recently considered a claim of Congressional abrogation of tribal sovereign immunity in *Lac du Flambeau*. There, the Court considered whether a provision in the Bankruptcy Code, which states that "sovereign immunity is abrogated as to a *governmental unit*" for certain purposes, applies to federally recognized Indian tribes. *Lac du Flambeau*, 599 U.S. at 387 (emphasis added) (quoting 11 U.S.C. § 106(a)). Given that the statute expressly provides for the abrogation of sovereign immunity, the case hinged on whether the tribe was a "governmental unit" as defined by 11 U.S.C. § 101(27). *Id.* at 388–93. The Court ultimately held that "[f]ederally recognized tribes undeniably fit that description; therefore the [Bankruptcy] Code's abrogation provision plainly applies to them as well." *Id.* at 388.

¶22    Generally, "[i]t is a tall order for a court to conclude that Congress abrogated tribal sovereign immunity." *Mestek v. LAC Courte Oreilles Cmty. Health Center*, 72 F.4th 255, 258 (7th Cir. 2023) (False Claims Act's anti-retaliation provision does not abrogate sovereign immunity); *see also Williams v. Poarch Band of Creek Indians*, 839 F.3d 1312 (11th Cir. 2016) (definition of "employers" under the Age Discrimination in Employment Act of 1967 does not abrogate sovereign immunity); *Memphis Biofuels, LLC v. Chickasaw Nation Indus.*, 585 F.3d 917 (6th Cir. 2009) (Indian Reorganization Act Section 17 does not abrogate sovereign immunity). The Sixth Circuit's decision in *Memphis Biofuels* provides a potent example of a court's refusal to read abrogation into a statute. In that case, the parties disagreed over whether Section 17 of the Indian Reorganization Act (IRA) abrogated the sovereign immunity of a tribe that elected to incorporate under the provision. *Memphis Biofuels*, 585 F.3d at 920. The provision reads:

> The Secretary of the Interior may, upon petition by any tribe, issue a charter of incorporation to such tribe . . . . Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and such further powers as may be incidental to the conduct of business, not inconsistent with law . . . .

*Id.* (quoting 25 U.S.C. § 477). The court recognized that this section was silent as to whether an incorporated tribe retains sovereign immunity. *Id.* The court concluded "that it is more appropriate to interpret this silence as *not* abrogating sovereign immunity." *Id.* (emphasis added). It reasoned that, first, abrogation may not be implied, and second, any statutory ambiguity should be construed in favor of tribes. *Id*. at 921.

¶23     Here, Section 6(c) of the Restoration Act does not contain a clear statement of congressional intent to abrogate the Tribe's immunity. The Association argues that the provision's reference to "valid existing rights" implies a right to enforce those rights by bringing suit against the Tribe in state or federal court. There are two problems with that argument. First, an abrogation of immunity must be explicit and will not be implied. Section 6(c) provides that land transferred to the United States by a *tribal member* remains "subject to . . . valid existing rights," such as a mortgage or lien. The provision does not expressly recognize or establish any rights of third parties vis-à-vis the *Tribe*, nor does it expressly authorize third parties to enforce a legal right or obligation in property transferred by a tribal member to the United States by bringing suit against the *Tribe* in state or federal court.

¶24     Second, even when Congress enacts legislation establishing a party's legal right vis-à-vis a tribe, the Supreme Court has held that such a legal right does not, by itself, demonstrate that Congress intended to abrogate the tribe's sovereign immunity from suit. *Okla. Tax Comm'n*, 498 U.S. 505. In *Oklahoma Tax Commission*, the Court recognized Oklahoma's authority to tax a tribe's sales of cigarettes to nontribal members. *Id.* at 512. Nonetheless, the Court held the tribe was immune from Oklahoma's suit to enforce the sales tax, rejecting the state's contention that this result gave it "a right without any remedy." *Id.* at 512, 514.

¶25     The Association in effect argues that Congress, by preserving the valid existing rights of third parties in reservation land, must have intended also to authorize third parties to sue the Tribe in state or federal court to enforce those rights, abrogating the Tribe's sovereign immunity. This court will not interpret the Restoration Act's references to "valid existing rights" and "valid existing obligations" in property transferred to trust by a tribal member more broadly than Congress intended. *See Bay Mills Indian Cmty*., 572 U.S. at 794 (declining to find that Congress implicitly authorized a state to sue a tribe for illegal gaming *off* reservation lands when it authorized the state to sue the tribe for illegal gaming *on* Indian lands, observing that the Court had "no roving

11

license . . . to disregard clear language simply on the view that . . . Congress 'must have intended' something broader").

¶26 Accordingly, given the absence of "unmistakably clear" language that abrogates immunity, we hold that the Restoration Act did not abrogate the Tribe's sovereign immunity.

*2. Waiver*

¶27 The Association argues that the Tribe waived its sovereign immunity by authorizing its member, Keshena, to acquire parcels whose deeds contain the restrictive covenants the Association adopted in 2009. The Association directs our attention to paragraphs 4(F) and (G) of the 2009 restrictive covenants, which provide:

> F. <u>Applicable Law; Jurisdiction and Venue</u>. Any and all actions or proceedings seeking to enforce any provision of, or based upon any right arising out of, these Restrictive Covenants running with the land <u>shall</u> be brought against a party in the Circuit Court of Menominee County, State of Wisconsin (sitting in Shawano, Wisconsin) where the land is situated, and any purchaser and/or transferee of the land that is a party to any such action, by accepting the deed thereto, consents to the exclusive jurisdiction and venue of such court (and the appropriate appellate courts therefrom) in any such action or proceeding and waives any objection to jurisdiction and venue laid therein.

> G. <u>Waiver of Defense</u>. By acceptance of a deed transferring title ownership of any portion of the Subject Real Estate, the title owner hereby waives any defense to an action filed with respect to these Restrictive Covenants by the Association based on sovereign immunity, and expressly consents to suit as provided for in Paragraph 4F above, and enforcement of any judgment rendered therein.

The Association argues that the Tribe is bound by these restrictive covenants, including the provision waiving sovereign immunity. In response, the Tribe and Keshena argue that the Association unilaterally imposed the restrictive covenants, that the Tribe never agreed to the restrictions, and that Keshena did not have any authority to waive the Tribe's immunity.

¶28 A tribe may elect to waive its sovereign immunity by contract, but much like abrogation, a waiver must be clear and unequivocal. *C&L Enters. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418 (2001); *Santa Clara Pueblo*, 436 U.S. at 58. Moreover, there is a strong presumption against waiver of tribal sovereign immunity. *Timber & Wood Prods.*, 379 Wis. 2d 690, ¶19.

¶29 The U.S. Supreme Court addressed a tribe's contractual waiver of immunity in *C&L Enterprises*. 532 U.S. at 414. There, a tribe entered a contract—which the tribe had proposed and drafted—with a construction company to replace a roof on a building owned by the tribe. *Id.* at 414–15. When a dispute arose under the contract, the company submitted an arbitration demand pursuant to the contract's arbitration clause, which provided that "all claims or disputes between the Contractor [C&L] and the Owner [the Tribe] arising out of or relating to the contract, or the breach thereof, shall be decided by arbitration." *Id.* at 415. The tribe refused to participate in the arbitration on grounds of sovereign immunity. *Id.* at 416. When the company later filed a lawsuit in state court to enforce the arbitration award, the tribe again asserted sovereign immunity. *Id.* The Court held that the tribe had waived its sovereign immunity from the lawsuit because it "agreed, by express contract, to adhere to certain dispute resolution procedures. In fact, the Tribe itself tendered the contract calling for those procedures." *Id.* at 420. It emphasized that the tribe did not "find itself holding the short end of an adhesion contract stick," and the company had "foisted no form on a quiescent Tribe." *Id.* at 423. More recently, in *Bay Mills Indian Community*, the Court reiterated that a party who wants to sue a tribe "need only bargain for a waiver of immunity." 572 U.S. at 796.

¶30 This case is readily distinguishable from *C&L Enterprises*. The Tribe did not draft the restrictive covenants or negotiate the restrictions with the Association. The Association unilaterally imposed the restrictive covenants on the Legend Lake parcels in 2009, in an effort to prevent the Tribe from restoring any of the property to its reservation. The Tribe did not purchase or acquire title to the lots. Thus, in the language of the covenants, it is not a "purchaser," did not "accept[] the deed[s]," and did not thereby "consent[] to the exclusive jurisdiction and venue" of the state court or "waive[] any objection to jurisdiction and venue laid therein." The Tribe never affirmatively agreed to waive its sovereign immunity in state court actions regarding the restrictive covenants.

¶31 The Association argues that the Tribe waived its sovereign immunity by authorizing Keshena to act as its agent in purchasing lots subject to the restrictive covenants. It posits that Keshena had both the actual and apparent authority to accept the waiver conditions in the restrictive covenants and that the Tribe is now bound by his actions. A review of Wisconsin's law on agency defeats the Association's position.

¶32 An agent can bind its principal via actual authority or apparent authority. "Actual authority is the power of the agent to do an act on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him." *Mared Indus. v. Mansfield*, 2005 WI 5, ¶23, 277 Wis. 2d 350, 690 N.W.2d 835 (citation modified). On the other hand, "apparent authority binds a principal to acts of another who reasonably appears to a third person to be authorized to act as the principal's agent, because of acts of the principal or agent if the principal had knowledge of those acts and acquiesced to them." *Id.*, ¶22.

¶33 Keshena had neither actual nor apparent authority to waive the Tribe's sovereign immunity. First, Keshena was not granted the actual authority to waive the Tribe's sovereign immunity. The tribal resolution providing for the appointment of a tribal member to acquire title to real property to be placed in trust with the United States did not authorize that member to waive tribal immunity.[10] The Association points to no acts or

---

[10] The Tribe also asserts that not only did the Tribal Legislature *not* authorize Keshena to waive its tribal sovereign immunity, but it could not have done so because the tribal constitution does not permit the Tribal Legislature to waive its sovereign immunity. *See* CONST. AND BYLAWS OF THE MENOMINEE INDIAN TRIBE OF WISCONSIN art. XVIII, §§ 1, 2. We note that the prevailing view among federal circuit courts is that a waiver of tribal sovereign immunity must comply with tribal law to be binding on the Tribe. *See, e.g., Memphis Biofuels, LLC v. Chickasaw Nation Indus.*, 585 F.3d 917, 921–22 (6th Cir. 2009); *Amerind Risk Mgmt. Corp. v. Malaterre*, 633 F.3d 680, 687–88 (8th Cir. 2011); *Caremark, LLC v. Choctaw Nation*, 104 F.4th 81, 90–92 (9th Cir. 2024); *Native American Distrib. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1293 (10th Cir. 2008); *Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1287 (11th Cir. 2001). Several state supreme courts have reached the same conclusion. *See, e.g., Dilliner v. Seneca-Cayuga Tribe*, 258 P.3d 516, 520 (Okla. 2011) ("[T]ribal law controls the way sovereign immunity can be waived by the Tribe."); *Calvello v. Yankton Sioux Tribe*, 584 N.W.2d 108, 113 (S.D. 1998) ("A waiver . . . must issue from a tribe's governing

statements of the Tribe manifesting an intent to authorize Keshena to waive the Tribe's sovereign immunity in connection with his purchases of land.

¶34    Keshena also did not have apparent authority to waive the Tribe's sovereign immunity. Apparent authority requires three elements to be present: (1) acts by the agent or principal justifying belief in the agency, (2) knowledge of those acts by the principal, and (3) reliance on those acts by the party asserting that apparent authority exists. *See Hansche v. A. J. Conroy, Inc.*, 222 Wis. 553, 560, 269 N.W. 309 (1936); Wis. JI—Civil 4005 (1994). Keshena could not have reasonably appeared to the Association to be authorized to waive the Tribe's sovereign immunity because the Association never dealt with Keshena in connection with his purchases of the lots. Nor can the Association point to anything it did in reliance on Keshena's authority. Without actual or apparent authority, Keshena could not bind the Tribe; thus, his purchase of lots subject to restrictive covenants cannot be deemed to have waived the Tribe's sovereign immunity.

¶35    Accordingly, we hold that neither the Tribe, nor Keshena as the Tribe's agent, waived tribal sovereign immunity over actions relating to the restrictive covenants. The Tribe did not purchase the lots and never accepted any deeds containing the immunity waiver the Association seeks to enforce against it. The Association identifies no other agreement or statements by the Tribe expressly waiving its sovereign immunity. Nor did Keshena have the actual authority or apparent authority to waive the Tribe's sovereign immunity.

*3. In Rem Exception*

¶36    The Association next asks this court to recognize a broad "in rem" exception to tribal sovereign immunity. It argues that a tribe's sovereign immunity does not bar an action in rem that does not seek to take possession of property. In other words, it asks this court to conclude

---

body, not from unapproved acts of tribal officials."); *Chance v. Coquille Indian Tribe*, 963 P.2d 638, 641 (Or. 1998) (acknowledging that a designation under a tribal resolution did not provide authority to unilaterally waive a tribe's sovereign immunity). Because we resolve the issue of whether Keshena waived the Tribe's sovereign immunity by applying agency law, we need not address this argument.

that the Tribe has no sovereign immunity from lawsuits brought in Wisconsin courts seeking a judgment against real property within the state's boundaries. *See* WIS. STAT. § 801.07 (in rem actions).[11] In the Tribe's view, an act of Congress is necessary to create an in rem exception to tribal sovereign immunity, and Congress has not so acted. We agree with the Tribe.

¶37 In rem jurisdiction, like personal jurisdiction, provides a basis for a court's exercise of its jurisdiction:

> If a court's jurisdiction is based on its authority over the defendant's person, the action and judgment are denominated "in personam" and can impose a personal obligation on the defendant in favor of the plaintiff. If jurisdiction is based on the court's power over property within its territory, the action is called "in rem" or "quasi in rem." The effect of a judgment in such a case is limited to the property that supports jurisdiction and does not impose a personal liability on the property owner, since he is not before the court.

*Timber & Wood Prods.*, 379 Wis. 2d 690, ¶30 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 199 (1977)).

¶38 The Supreme Court has recognized that the exercise of in rem jurisdiction by federal admiralty and bankruptcy courts prevails over a state's assertion of sovereign immunity under the Eleventh Amendment. *See, e.g.*, *California v. Deep Sea Rsch.*, 523 U.S. 491 (1998) (where state was not in possession of shipwreck, claims to shipwreck were within exclusive admiralty jurisdiction of federal court under Article III, Section 2, Clause 1, overriding state's assertion of sovereign immunity and claim of title); *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356 (2006) (Bankruptcy Clause

---

[11] We note that the complaint in this case was captioned as an in personam action against the Menominee Tribe and Guy Keshena, not as an in rem action naming as its subject a parcel of real property. *See* WIS. STAT. § 801.07; *see also DNR v. Timber & Wood Prods. Located in Sawyer Cnty.*, 2018 WI App 6, 379 Wis. 2d 690, 906 N.W.2d 707 (Ct. App. 2017) (action brought against "timber and wood products located in Sawyer County"). Because the Tribe does not raise the issue, we address the merits of the Association's argument despite this procedural discrepancy.

authorizes Congress to treat states like other creditors in actions to recover preferential transfers). In *Deep Sea Research* and *Katz*, the Court did not recognize a broad in rem exception to sovereign immunity, but rather resolved an apparent conflict between the Eleventh Amendment and a constitutional provision conferring exclusive federal jurisdiction over a particular subject matter. No such conflict is present here to warrant a similar limitation on tribal sovereign immunity.

¶39    The U.S. Supreme Court has not addressed whether in rem jurisdiction provides an exception to tribal sovereign immunity. The Court granted certiorari to consider the issue in *Upper Skagit Indian Tribe v. Lundgren*, 584 U.S. 554, 556 (2018). The Court ultimately did not answer that question, however, and instead clarified the scope of its prior decision in *County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation*, 502 U.S. 251 (1992). *Yakima* addressed whether a state could tax "'fee-patented' land [i.e., land not held in trust by the federal government] located within the Yakima Indian Reservation." 502 U.S. at 253. The Court held that federal law allowed the state to impose property taxes on fee-patented land in the reservation, but not to impose excise taxes on sales of such land. *Id.* at 270. Lower courts subsequently interpreted *Yakima* broadly to "mean[] Indian tribes lack sovereign immunity in *in rem* lawsuits." *Upper Skagit*, 584 U.S. at 556. The Court clarified in *Upper Skagit* that "*Yakima* did not address the scope of tribal sovereign immunity" and "resolved nothing about the law of sovereign immunity," but addressed only a "much more prosaic question of statutory interpretation." *Id.* at 558–59. It vacated the Washington Supreme Court's decision misapplying *Yakima* and remanded the case for further proceedings to resolve the parties' dispute as to whether tribal sovereign immunity barred the in rem lawsuit. *Id.* at 559–61.[12]

¶40    Since *Upper Skagit*, the Washington Supreme Court is the only court that has addressed whether sovereign immunity protects tribes against in rem actions. *See Flying T Ranch, Inc. v. Stillaguamish Tribe of Indians*, 577 P.3d 382 (Wash. 2025). In *Flying T Ranch*, a corporation that owned land adjacent to tribal land filed a complaint against the tribe seeking title to a strip of land via adverse possession. *Id.* at 385. The court found that "jurisdiction over real property does not waive tribal sovereign

---

[12] The case did not result in a published decision by the Washington Supreme Court on remand.

immunity." *Id.* at 390. It thus upheld the tribe's assertion of sovereign immunity, holding that "case law does not support finding in rem jurisdiction over land owned by tribes to determine if there is a viable adverse possession claim." *Id.*

¶41     While this court has not had an opportunity to address this issue, the court of appeals did prior to *Upper Skagit* in *Timber & Wood Products. See* 379 Wis. 2d 690. There, the court of appeals considered whether the Department of Natural Resources (DNR) could recover taxes it alleged a tribe owed under Wisconsin's Forest Croplands Law. *Id.*, ¶1. The DNR argued that, notwithstanding the tribe's sovereign immunity, it could assert an in rem claim against the timber and wood products located on the tribal property. *Id.*, ¶30. The circuit court granted the tribe's motion to dismiss, concluding that tribal sovereign immunity barred the suit. *Id.*, ¶1. The court of appeals affirmed, holding that "the Tribe's sovereign immunity prevents the DNR from filing suit against the Tribe or its 'Timber and Wood Products' to collect [] taxes." *Id.*, ¶39. The court, foreshadowing *Upper Skagit*, distinguished *Yakima* on grounds that it resolved a question of the tribe's sovereign *authority*, not sovereign immunity. *Id.*, ¶¶37–39. The court also cited cases addressing the sovereign immunity of states as persuasive authority that counseled against allowing the DNR's in rem claim to proceed. *See id.*, ¶¶40–46. Lastly, the court reasoned that allowing in rem claims to proceed against tribal property would permit the taking of that property, and "[s]uch a result would be contrary to one of the primary purposes of sovereign immunity—protecting tribal treasuries." *Id.*, ¶47.

¶42     We agree with the reasoning set forth in *Timber & Wood Products* and hold that in rem claims do not operate as an exception to tribal sovereign immunity. Contrary to the Association's argument, the court's analysis in *Timber & Wood Products* did not turn on whether a claim asserted against a tribe seeks possession of property. Rather, the court of appeals correctly read *Yakima* as addressing the scope of a tribe's sovereign authority, not sovereign immunity. This reasoning was borne out by the U.S. Supreme Court's decision in *Upper Skagit*, which clarified that *Yakima* was not intended to defeat tribal immunity in cases brought in rem. Our decision is also consistent with *Flying T Ranch*, the only other decision by a state high court on this issue, and with cases addressing the sovereign immunity of states in actions brought in rem. *See Timber & Wood Prods.*, 379 Wis. 2d 690, ¶¶40–41. And as a practical matter, the Association's claims potentially have significant financial consequences for the Tribe: the restrictive covenants it seeks to enforce would largely

block the Tribe from generating income from the land and subject the Tribe to associational dues and assessments, among other things. Allowing such claims to proceed would be fundamentally at odds with protecting tribal treasury, one of the primary aims of sovereign immunity. Accordingly, we hold that there is no in rem exception to tribal sovereign immunity.

### 4. *Immovable Property Exception*

¶43     The Association's final argument is that the common law "immovable property" exception applies to defeat the Tribe's assertion of sovereign immunity because the Keshena lots are "within the territory of another sovereign (the State of Wisconsin)." "Generally speaking, [the immovable property] exception refers to a common law doctrine that curtails sovereign immunity in legal actions contesting a sovereign's rights or interests in real property located within another sovereign's territory." *Cayuga Indian Nation of N.Y. v. Seneca County*, 978 F.3d 829, 834 (2d Cir. 2020). By way of example, "[a] prince, by acquiring private property in a foreign country, may possibly be considered as subjecting that property to the territorial jurisdiction; he may be considered as so far laying down the prince, and assuming the character of a private individual." *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 145 (1812). Indeed, the exception "developed primarily in the context of international law," premised on the ideas that property ownership is not strictly a sovereign function and that states have an interest in resolving disputes over real property within their territory. *Cayuga Indian Nation*, 978 F.3d at 836.[13]

¶44     The Association argues that tribal sovereign immunity is subject to a common law immovable property exception unless Congress says otherwise, and that Congress has not affirmatively exempted tribal sovereign immunity from the immovable property exception. The Tribe and Keshena counter that Congress has codified an immovable property exception to sovereign immunity applicable to foreign states[14] but has not

---

[13] The Second Circuit ultimately declined to decide whether the exception limits tribal sovereign immunity, concluding instead that the exception does not apply in foreclosure actions. *Cayuga Indian Nation of N.Y. v. Seneca County*, 978 F.3d 829, 835–40 (2d Cir. 2020).

[14] The Foreign Sovereign Immunities Act codified this exception with respect to foreign sovereigns, expressly providing that "[a] foreign state shall not

authorized such an exception to tribal sovereign immunity. Further, they argue that an immovable property exception should not apply here because the Keshena lots are part of the Menominee Reservation and thus within the Tribe's jurisdiction.

¶45 The Association cites no case in which a court has recognized a common law immovable property exception to tribal sovereign immunity.[15] In *Upper Skagit*, even though the plaintiff raised the immovable property exception as an alternate ground to affirm the Washington Supreme Court, the U.S. Supreme Court declined to decide the question. 584 U.S. at 559–61. We note, however, that the land at issue in *Upper Skagit* was not part of the tribe's reservation, but was a parcel purchased by the tribe in a market transaction. *Id.* at 556–57. This distinction appears to undergird Justice Thomas's dissent, which argued that our nation's founders "would be shocked to learn that an Indian tribe could acquire property in a State and then claim immunity from that State's jurisdiction." *Id*. at 574 (Thomas, J., dissenting).

¶46 Since *Upper Skagit*, two other courts have considered whether an immovable property exception applies to tribal sovereign immunity. The Washington Supreme Court recently declined to recognize a common law immovable property exception to tribal sovereign immunity. *See Flying T Ranch*, 577 P.3d at 391–94. The court rejected the plaintiff's argument that the exception applies because "Congress has taken no action to remove" it, reasoning that, to the contrary, "[t]ribal sovereign immunity applies unless Congress takes action stating otherwise," and Congress has not enacted an immovable property exception to tribal sovereign immunity. *Id.* at 391. The court acknowledged that the exception "primarily emerged in the context of *foreign* sovereign immunity. But tribes are not foreign nations." *Id.* at 392. Rather, "the United States Supreme Court has described tribes as

---

be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which . . . rights in immovable property situated in the United States are in issue." 28 U.S.C. § 1605(a)(4).

[15] Likewise, Justice Bradley's dissent, although long on invective, identifies no case in which a court has held that the common law immovable property exception applies to limit the sovereign immunity of tribes, relying instead on case law discussing the exception as it applies to states and foreign nations.

'domestic dependent nations' with a unique relationship to the federal government." *Id.* (quoting *Cherokee Nation*, 30 U.S. (5 Pet.) at 17). The court recognized, accordingly, that "when Congress enacted the [Foreign Sovereign Immunities Act (FSIA)], it did not expressly include the tribes, suggesting it did not intend the immovable property exception, whether in the FSIA or common law, to apply to tribes." *Id.*

¶47 Likewise, the California Court of Appeal has held that the common law immovable property exception to sovereign immunity does not extend to tribes. *Self v. Cher-Ae Heights Indian Cmty. of Trinidad Rancheria*, 274 Cal. Rptr. 3d 255, 259 (Cal. Ct. App. 2021), *cert. denied*, 142 S. Ct. 1107 (2022). In reaching this conclusion, the court rejected plaintiffs' reliance on state sovereign immunity, which "turns on the nature of the constitutional compact as informed by the Eleventh Amendment," and "[t]ribes, who were not parties to that compact, did not surrender any aspect of their sovereignty as part of the constitutional plan." *Id.* at 260. Further, the court noted that while *Georgia v. Chattanooga*, 264 U.S. 472 (1924) limits state immunity to traditional sovereign activities, "the Supreme Court has not limited tribal immunity" in that way. *Self*, 274 Cal. Rptr. 3d at 260. The court also rejected plaintiffs' arguments based on foreign sovereign immunity, observing that "tribes are not foreign sovereigns" and that "the relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist nowhere else." *Id.* at 261 (quoting *Cherokee Nation*, 30 U.S. (5 Pet.) at 16). Lastly, the *Self* court identified two other reasons that counsel against applying an immovable property exception to tribes: "[d]eferring to Congress on tribal immunity has been the Supreme Court's practice for decades" and "tribal land acquisition is a key feature of modern federal tribal policy, which Congress adopted after its prior policy divested tribes of millions of acres of land." *Id.* at 261–62.

¶48 We decline to recognize a common law immovable property exception to tribal sovereign immunity. "[T]he common law immovable property exception has never been applied in the context of Indian tribes, which are domestic dependent nations." *Flying T Ranch*, 577 P.3d at 394. The reasoning of the two courts that have considered and rejected the exception in the context of tribal sovereign immunity is sound. *See supra* ¶¶46–47; *see also Flying T Ranch*, 577 P.3d at 390–94; *Self,* 274 Cal. Rptr. 3d at 259–63. The sovereign immunity enjoyed by states, foreign governments, and Indian tribes each derives from a distinct source and principles. They are not coextensive. Tribal sovereignty is a recognition of tribes' "'original natural rights' in matters of local self-government,"

predating the formation of the United States. *Santa Clara Pueblo*, 436 U.S. at 55 (quoting *Worcester*, 31 U.S. (6 Pet.) at 559). Applying an immovable property exception to tribal sovereign immunity would disregard these historical origins and the fact that tribes possess a "special brand of sovereignty" that "rests in the hands of Congress." *Bay Mills Indian Cmty.*, 572 U.S. at 800. As the court in *Self* succinctly explained: "For decades, the Supreme Court has treated tribal sovereign immunity as settled law, and deferred to Congress for the simple reason that it is fundamentally Congress's job, not ours, to determine whether or how to limit sovereign immunity. We see no reason to depart from this practice." 274 Cal. Rptr. 3d at 262 (citation modified). Thus, we defer to Congress to determine whether to carve out further exceptions to tribal sovereign immunity, rather than adopting a heretofore unrecognized exception under the guise of common law.

¶49    Even if the Association had cited any precedent establishing that a common law immovable property exception to tribal sovereign immunity exists, the exception would not apply in this case.[16] The Association's argument about an immovable property exception is based on the flawed premise that the Keshena lots are exclusively within the territory and jurisdiction of another sovereign, namely the state of Wisconsin. The Keshena lots are now owned by the United States and are part of the Menominee Reservation. "[A]ll land within reservation boundaries is Indian country," COHEN'S HANDBOOK § 4.04[2][c][ii], at 235, and "primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States." *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998). While "the Constitution allows a State to exercise jurisdiction in Indian country," that jurisdiction is not exclusive. *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 636 (2022) (holding that state and federal government have concurrent jurisdiction to prosecute crimes committed by non-Indians in Indian country). This overlapping territorial jurisdiction undermines the Association's position that, for purposes of this dispute, the Tribe should be deemed to stand in the position of a private individual, like the hypothetical foreign prince who acquires private property in another nation, thus subjecting himself to that sovereign's jurisdiction. *Schooner Exch.*, 11 U.S. (7 Cranch) at 145.

---

[16] Justice Bradley's dissent concedes that the immovable property exception would not apply to reservation lands.

¶50   Lastly, applying an immovable property exception here would not merely subject the Tribe to the jurisdiction of a state court for the resolution of a dispute. It would fundamentally undercut the Tribe's sovereign *authority* over its reservation lands, as well as the federal government's primary jurisdiction over Indian Country. Thus, even if an immovable property exception to tribal sovereign immunity existed, it would not apply in the present situation.

\* \* \*

¶51   To summarize, nothing abrogates, waives, or otherwise precludes the Tribe's sovereign immunity. Accordingly, the Tribe is immune from the Association's lawsuit.

## B.  KESHENA

¶52   The Association's action against Keshena also ends here. First, Keshena is no longer a proper defendant. The Association seeks a declaratory judgment that the portions of the 2009 restrictive covenants that do not prohibit transfers to the Tribe are valid and legally enforceable with respect to the Keshena lots. Such a claim is not properly asserted against Keshena because he no longer holds title to or an interest in the Keshena lots: the United States holds title for the benefit of the Tribe. Moreover, the Association has never requested any retrospective relief against Keshena.

¶53   Second, even if Keshena remained a proper defendant, the Tribe's sovereign immunity would bar the claims raised against Keshena, because the Tribe is the real party in interest. To determine if a sovereign is the real party in interest, courts "must determine in the first instance whether the remedy sought is truly against the sovereign." *Lewis v. Clarke*, 581 U.S. 155, 162 (2017). This rule applies with equal force "in the context of tribal sovereign immunity." *Id.* at 163. The Association's desired remedy—enforcement of the 2009 restrictive covenants against the Keshena lots—would operate against the Tribe, as it is the beneficiary of land held in trust by the United States. Keshena was named as a defendant to prohibit him from transferring the lots to the United States—something that has already happened and that the Association cannot further challenge in state court. The Tribe's sovereign immunity bars the Association's remaining claims asserted against Keshena.

### III.  CONCLUSION

¶54     Tribal sovereign immunity is the rule, not the exception. A litigant can overcome tribal sovereign immunity if Congress abrogates it or if a tribe clearly waives it. Neither occurred here. Nor does the Association persuade us that in rem or immovable property exceptions defeat a tribe's sovereign immunity from suit. The Tribe's sovereign immunity extends to Keshena, assuming he is a proper defendant in this case, because the Tribe is the real party in interest. Our determination that the Tribe and Keshena are immune from suit is dispositive and we reach no other issue raised by the parties.

¶55     Today's decision provides finality to the parties and acknowledges that factual circumstances have changed since the filing of the complaint, namely that the United States now holds title to the Keshena lots. We acknowledge that "a fundamental commitment of Indian law is judicial respect for Congress's primary role in defining the contours of tribal sovereignty." *Bay Mills Indian Cmty.*, 572 U.S. at 803. The "[e]xclusion of states from tribal and Indian affairs was a founding principle of constitutional law and federal policy." COHEN'S HANDBOOK § 7.01, at 428–29. Our decision accords with these principles, affirming that tribes are immune from suit in Wisconsin state courts unless such immunity is expressly abrogated by Congress or affirmatively waived by the tribe.

*By the Court.*—The judgment of the circuit court is affirmed.

REBECCA GRASSL BRADLEY, J., with whom ANNETTE KINGSLAND ZIEGLER, J., joins, dissenting.

¶56 "The correct answer cannot be that the tribe always wins no matter what; otherwise a tribe could wield sovereign immunity as a sword and seize property with impunity, even without a colorable claim of right." *Upper Skagit Indian Tribe v. Lundgren*, 584 U.S. 554, 562 (2018) (Roberts, C.J., concurring). The majority confers the sword of sovereign immunity on tribes, replacing "the common-law immunity from suit traditionally enjoyed by sovereign powers[,]" *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978), with absolute immunity subject only to Congress's specific articulations of exceptions to sovereign immunity. The majority has no authority to require Congress to enact common-law exceptions, and it has no basis in law for granting tribes immunity beyond what the common law provides.

¶57 I join Justice Hagedorn's dissent in full because the majority improperly resolves this dispute without the participation of the United States, which owns the property at issue. I write separately because the majority's usurpation of Congress's prerogative should not evade criticism simply due to its error at the threshold.

¶58 Under the law, tribes have only the "common-law immunity from suit traditionally enjoyed by sovereign powers." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *Santa Clara Pueblo*, 436 U.S. at 58). Such immunity includes all exceptions under the common law. Specifically, "a foreign sovereign's immunity does not extend to 'an action to obtain possession of or establish a property interest in immovable property located in the territory of the state exercising jurisdiction.'" *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 200 (2007) (quoting RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 68(b), p. 205 (1965)) (discussing the status of the immovable property exception at the time of enactment of the Foreign Sovereign Immunities Act of 1976). The immovable property exception is a common-law exception to sovereign immunity, and it is deeply rooted in the nation's history. *Upper Skagit Indian Tribe*, 584 U.S. at 566–67 (Thomas, J., dissenting) (citing H. Lauterpacht, *The Problem of Jurisdictional Immunities of Foreign States*, 28 BRIT. Y.B. INT'L L. 220, 244 (1951)) (observing that the immovable property exception to sovereign immunity

has existed for centuries and "has been hornbook law almost as long as there have been hornbooks"); *see Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 145 (1812).

¶59     Sovereigns lack immunity over immovable property within the territory of another sovereign because "property ownership is not an inherently sovereign function." *Permanent Mission of India to the United Nations*, 551 U.S. at 199. Indeed, the Supreme Court has long observed that "[a] prince, by acquiring private property in a foreign country, may possibly be considered as subjecting that property to the territorial jurisdiction; he may be considered as so far laying down the prince, and assuming the character of a private individual." *Schooner Exch.*, 11 U.S. (7 Cranch) at 145. Concomitantly, "[a] territorial sovereign has a primeval interest in resolving all disputes over use or right to use of real property within its own domain." *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1521 (D.C. Cir. 1984) (Scalia, J.).

¶60     "[B]ecause 'land is so indissolubly connected with the territory of a State,' a State 'cannot permit' a foreign sovereign to displace its jurisdiction by purchasing land and then claiming 'immunity.'" *Upper Skagit Indian Tribe*, 584 U.S. at 568 (Thomas, J., dissenting) (quoting *Competence of Courts in Regard to Foreign States*, 26 AM. J. INT'L L. SUPP. 451, 578 (1932)). The immovable property exception is so pervasive in the common law that it applies not only to foreign sovereigns but also to the States. *See Permanent Mission of India to the United Nations,* 551 U.S. at 200; *Georgia v. Chattanooga*, 264 U.S. 472, 480 (1924) ("Land acquired by one state in another state is held subject to the laws of the latter and to all the incidents of private ownership.").

¶61     This common-law exception to sovereign immunity applies to tribes because they have the "common-law immunity from suit traditionally enjoyed by sovereign powers." *Bay Mills Indian Cmty.*, 572 U.S. at 788 (quoting *Santa Clara Pueblo*, 436 U.S. at 58). The common-law immunity from suit traditionally enjoyed by sovereign powers naturally carries with it all the caveats and exceptions existing at common law, including the exception for immovable property located in the territory of another sovereign. In granting tribes immunity in contravention of the common law, the majority manufactures a novel immunity with no legal

foundation. By fashioning a new rule based on its preferences, the majority usurps Congress's prerogative in this realm, and unlawfully expands sovereign immunity with no authority to do so.

¶62    The majority gaslights the reader by declaring tribal immunity from suit over property located in the territory of another sovereign to be "settled law" while proclaiming its deference to Congress. Majority op., ¶48. Far from applying "settled law," the majority invents a new immunity for tribes out of whole cloth. The majority cites zero binding authority or even a consensus of other jurisdictions in accord with the majority to support its farcical assertion. Instead, the majority parrots two non-binding cases in which other courts expanded immunity in so-called "deference" to Congress, along with United States Supreme Court precedent generally declaring tribal sovereign immunity "settled law."

¶63    If the majority actually were deferring to Congress, it would recognize the immovable property exception is well-rooted in the common law and has been left undisturbed by Congress. Congressional inaction leaves the default rule intact. Without explaining why, the majority simplistically assumes Congress wanted absolute immunity for the tribes. The majority's inference is baseless. The non-binding cases on which the majority relies in turn rely on cases addressing immunity for commercial activities.  The law on *that* subject may indeed be considered settled because the Court has repeatedly addressed it. In contrast, the last time the immovable property exception was brought before the Court, it declined to address the issue.

¶64    As the law currently stands, tribes are not immune from suits concerning immovable property located in the territory of another sovereign. "[T]ribes possess the 'common-law immunity from suit traditionally enjoyed by sovereign powers.'" *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 387 (2023) (quoting *Santa Clara Pueblo*, 436 U.S. at 58). A sovereign who acquires immovable property in another sovereign's territory assumes the character of a private individual. *See Schooner Exch.*, 11 U.S. (7 Cranch) at 145; *Permanent Mission of India to the United Nations,* 551 U.S. at 199–200; *Georgia v. Chattanooga*, 264 U.S. at 480. Courts cannot extend tribal sovereign immunity beyond what the common law provides. *See Lewis v. Clarke*, 581 U.S. 155, 163–64 (2017). "Settled law" compels this court to acknowledge

3

and respect the immovable property exception. The United States Supreme Court's recent decision not to revisit the exception does not give this court free rein to alter the common law.

¶65 In an effort to establish a legal basis for its ruling, the majority notes "that tribes possess a 'special brand of sovereignty'" distinct from foreign nations and the States. Majority op., ¶48. It reasons that because "[t]ribal sovereignty is a recognition of tribes' original natural rights in matters of local self-government," the immovable property exception does not apply to tribes. *Id.* (citation omitted) (citation modified). The majority attempts to distinguish tribes from foreign nations and the States because Congress has articulated the scope of sovereignty applicable to foreign nations in the Foreign Sovereign Immunities Act, and States' immunities are limited by the constitutional compact—neither of which applies to tribes. *Id.*, ¶¶46–47. While tribes do derive their immunity from their "original natural rights," tribes nevertheless possess only "common-law immunity from suit traditionally enjoyed by sovereign powers." *Coughlin*, 599 U.S. at 387. The majority identifies nothing about the "original natural rights" of tribes that alters their common law immunity.

¶66 The fact that Congress enacted a law codifying the limits of sovereign immunity of foreign nations has no bearing on the scope of the sovereign immunity of tribes. *See Permanent Mission of India to the United Nations*, 551 U.S. at 200 ("[T]he [Foreign Sovereign Immunities Act] was also meant 'to codify . . . the pre-existing real property exception to sovereign immunity recognized by international practice.'" (quoting *Asociacion de Reclamantes*, 735 F.2d at 1521 (Scalia, J.))). The Foreign Sovereign Immunities Act has nothing to say about the sovereign immunity of tribes. "The principle that a matter not covered is not covered is so obvious that it seems absurd to recite it." *Koble Investments v. Marquardt*, 2026 WI 19, ¶37, ___ Wis. 2d ___, ___ N.W.2d ___ (Bradley, J., concurring) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93 (2012)).

¶67 The immovable property exception applies to the States not because of the constitutional compact but because acquiring property in the territory of another sovereign "is a private undertaking[,]" and a

State's sovereignty does not extend into the territory of another sovereign. *Georgia v. Chattanooga*, 264 U.S. at 481. These principles apply to tribes with equal force, but the majority inexplicably refuses to apply a rule that explicitly applies to virtually every sovereign in existence. The majority neglects to explain what "'original natural rights' in matters of local self-government" belong to tribes that confer immunity from suit regarding land outside of their territory—a right that belongs to no other sovereign.

¶68 With no legal basis, the majority expands tribal immunity beyond what sovereigns traditionally enjoyed at common law. Puzzlingly, the majority professes to defer to Congress by concocting a new immunity rule requiring Congress to expressly declare common-law exceptions to immunity before the majority will acknowledge them. Far from "deferring" to Congress, the majority unlawfully tells Congress what it must do to prevent the judiciary from invading Congress's realm. At the same time, the majority flouts longstanding Supreme Court precedent recognizing tribal common-law immunity. *See Coughlin*, 599 U.S. at 387; *Santa Clara Pueblo*, 436 U.S. at 58; *Bay Mills Indian Cmty.*, 572 U.S. at 788.

¶69 In the face of contrary law and marshalling only feeble reasoning, the majority resorts to policy justifications for its activism, arguing that supporting tribal land acquisition is a key feature of modern federal tribal policy. Majority op., ¶47. So? Although the Supreme Court has permitted the policies of the political branches to alter its immunity determinations, the Court has clearly prohibited the judiciary from "allow[ing] an immunity on new grounds which the government has not seen fit to recognize." *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945). The fact that Congress supports the growth of reservations does not authorize the judiciary to immunize tribes from suits involving non-reservation land.

¶70 Actual deference to Congress should compel this court to refrain from extending immunity in cases concerning immovable property outside of a tribe's territory. Congress's decision not to expand immunity does not allow the judiciary to alter the scope of common-law immunity. Nothing in the law requires Congress to appease the majority's request for an explicit delineation of common-law immunity. Forcing Congress to override the majority's activism creates a serious separation of powers

problem. Instead of remaining within the judicial domain of interpreting the law, the majority invades the legislative domain of making the law. The majority creates absolute immunity restricted only by Congress's pronounced exceptions, effectively eliminating longstanding exceptions to which tribes were already subject.

¶71    To make matters worse, the court's error was entirely avoidable. During the course of this litigation, the United States took the property into trust, making the disputed land part of the Tribe's reservation. In this case, the Legend Lake Property Owners Association, Inc.'s suit concerns land within the Tribe's territory. Because the land is part of the Tribe's reservation, the immovable property exception does not apply in this case—which the majority explicitly acknowledges.[1] Majority op., ¶49. The majority could have reached the result it wanted without rewriting the law in the process. Rather than deciding the case before the court, the majority promulgates a new rule contravening the traditional common-law immunity enjoyed by sovereigns. Because the court usurps the prerogative of Congress and decides issues impacting United States' property without the United States present, I dissent.

---

[1] The majority says I "concede[] that the immovable property exception would not apply to reservation lands[,]" but the majority misses the point. Majority op,. ¶49 n.16. The immovable property exception applies only when the sovereign owns land in the territory of another sovereign. Because the land at issue exists within the Tribe's reservation, the immovable property exception does not apply in this case. Because the exception does not apply, the majority's decision to write the exception out of the law is unnecessary. The majority should explain why it opines on an issue that has no bearing on the disposition of the case—in the process doing grave damage to the law.

BRIAN K. HAGEDORN, J., with whom ANNETTE KINGSLAND ZIEGLER and REBECCA GRASSL BRADLEY, JJ., join, dissenting.

¶72     This case raises thorny federal and tribal law issues affecting the property rights pertaining to lots in the Legend Lake Property Owners Association. But these questions come to us in a most unusual posture. The long and short of it is that the owner of the lots—the United States government—is not a party to this case. Therefore, we should not decide these weighty and consequential legal questions without the owner of the property having its day in court.

¶73     Bear with me here; we must dip our feet into the messy procedural waters to understand how we got here. In 2017, a member of the Menominee Indian Tribe named Guy Keshena purchased the lots at issue. Under the Menominee Restoration Act, and as a member of the Tribe, Keshena could ask the United States to hold these properties in trust for the Tribe. He did so in 2018. Later that year, the Association commenced this litigation in state court against Keshena and the Tribe seeking to enforce its restrictive covenants on the land. The Association also challenged the transfer of the lots to the United States before the Bureau of Indian Affairs, and later in federal court. In the end, the upshot for our purposes is that the land was accepted by the United States into trust and officially transferred to it in 2023. Federal litigation in 2024 upheld this transfer. Meanwhile, back in 2022, the circuit court in our case granted the Tribe's motion to dismiss. The Association appealed, and after accepting additional briefing on the effects of the federal decision, the court of appeals certified the case to us in January 2025.

¶74     This litigation, then, was fundamentally transformed in 2023—five years after the initial suit was filed and well after the circuit court's decision we are reviewing. This suit continues before us with the Association on the one hand and the Tribe and Keshena on the other hand. Who's missing? The United States—the party that owns the land. Thus, it is exceedingly odd—and in my view, improper—for this court to pass judgment on complicated matters of federal and tribal law when the property owner potentially affected by those determinations is not a party to the litigation.

¶75     It seems obvious that the property owner should be included in litigation that adjudicates the rights and duties attendant to that property. More importantly, our rules of civil procedure require it.

¶76    WISCONSIN STAT. § 803.03(1) provides that a party must be joined to the litigation if certain criteria are satisfied. First, the potential party must "claim[] an interest relating to the subject of the action." WIS. STAT. § 803.03(1).[1] The United States has claimed an interest in the property and defended against a suit challenging this right in federal court. Proceeding to the second requirement, the party must be joined if either of two conditions is met: 1) "In the person's absence complete relief cannot be accorded among those already parties," or 2) the judgment will "[a]s a practical matter impair or impede the person's ability to protect that interest." WIS. STAT. § 803.03(1)(a); § 803.03(1)(b)1. Both of these are satisfied. This litigation seeks to create binding duties and recognize certain rights and limitations regarding real property. But that can't happen in a way that binds the landowner without the landowner participating in the litigation. That is, the Association would want the landowner to fulfill the obligations it seeks to impose on the land, which cannot be made effective without the landowner participating and therefore being subject to the court order. Thus, complete relief cannot be given because the United States is not bound by any judgment. In the alternative, the United States' interest in using the properties would be impaired or impeded by an adverse judgment in this case because a judgment about the property rights pertaining to land will obviously impact the landowner. In this case, the landowner is the United States, so the United States ought to have a voice in these proceedings. From any vantage point, the requirements of § 803.03(1) are satisfied.

¶77    That being the case, the statute *requires* the United States to be joined unless it "cannot be made a party." WIS. STAT. § 803.03(3). Here, the Association argues that the United States cannot be made a party because of its own sovereign immunity. This, too, is an argument that we should allow the United States to answer for itself. But even if the United States could not be made a party, the court must still consider "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed" because the absent party is "indispensable." *Id.* The statute provides four factors to consider in determining whether a party is indispensable:

---

[1] The statute also calls for joinder if the judgment will "[l]eave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of his or her claimed interest." WIS. STAT. § 803.03(1)(b)2. This provision does not apply here.

(a) To what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties;

(b) The extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided;

(c) Whether a judgment rendered in the person's absence will be adequate; and

(d) Whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

*Id.*

¶78     Here, the equities and conscience weigh heavily in favor of finding the United States indispensable. As already mentioned, a judgment may be prejudicial to the United States. There is no remedy to shape the burdens on the land without the presence of the landowner. And as already explained, the judgment is not adequate without the United States because the judgment would impose restrictions on the land, presumably to be enforced against the landowner. If the Association has a right to a remedy, it can obtain judgment against the United States in some other proceeding. These factors in our civil procedure statute counsel in favor of dismissing the action. While the majority also dismisses the case, it does so based on its answers to the broad jurisdictional questions, all without the United States. Even if the United States cannot be joined, the correct answer is not to plunge ahead and resolve the important and messy federal questions. Rather, the case should be dismissed as a matter of procedure, and leave the resolution of weightier questions to a case that has the necessary and indispensable parties. These statutes, then, do double work against the majority's approach. First, they require joining the United States to this action. Second, if the United States could not be joined, the statutory factors require dismissing the action as a matter of procedure—not resolving the jurisdictional dispute without the appropriate parties.

¶79     The Tribe and Keshena also argue that our declaratory judgment statute requires the United States to be joined. It provides: "When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and

3

no declaration may prejudice the right of persons not parties to the proceeding." WIS. STAT. § 806.04(11). The Association does seek a declaratory judgment, and the interests of the United States would be affected by a court ruling adjudicating property rights on land it owns. Under these procedural requirements as well, the United States must be made a party to this action.

¶80   In the face of all this, the majority ignores these matters of procedural law and decides the far-reaching substantive issues before us. The majority contends it is proper to wade into these matters because tribal sovereign immunity is a jurisdictional defense. Majority op., ¶15 n.8.

¶81   There are at least two problems with this argument. First, the majority cites no Wisconsin authority mandating its methodology here. The decision to wade into these matters is one of choice, not necessity. Second, and more importantly, the court's decision in this case is not the type of immunity claim that ignores the merits. It is rather an immunity claim that is intimately intertwined with the merits of the dispute. The majority decides important and far-reaching matters of federal law that have vast consequences for the rights of tribes, private parties who do business with tribes, and the actual landowner—the United States.

¶82   Rather than issue a sweeping ruling, the more prudent path—and the procedurally mandated course—is to send this case back to the circuit court for a consideration of whether the United States can be joined as a party. While the circuit court already rendered a decision, this was before circumstances changed in 2023. This court should not decide these substantive questions without the proper parties before it. For these reasons, I respectfully dissent.